702 So.2d 695 (1997)
John Dale BELLARD, et al., Plaintiffs-Appellees,
v.
SOUTH CENTRAL BELL TELEPHONE COMPANY, et al., Defendants-Appellants.
No. 96-1426.
Court of Appeal of Louisiana, Third Circuit.
August 27, 1997.
Writ Denied December 12, 1997.
*698 Larry A. Roach, Lake Charles, for John D. Bellard, et al.
Douglas C. Longman, Jr., Lafayette, for South Central Bell Telephone Co., et al.
Carol Stookey Hunter, Rayne, for Acadia Parish Police Jury.
Before COOKS, SAUNDERS, DECUIR, AMY and GREMILLION, JJ.
GREMILLION, Judge.
This case arises from a vehicular collision between a South Central Bell Telephone Company truck and a 1979 Ford Thunderbird which occurred on a bridge on Parish Road 7-23 (Perchville Road), located in Acadia Parish. John Dale Bellard, individually and as natural tutor of his minor son, Nicholas Bellard, and his wife, Jennifer Bellard (the Bellards), the driver and passengers of the Ford Thunderbird, respectively, brought suit against South Central Bell Telephone Company (SCB) and the Acadia Parish Police Jury (Police Jury) as the result of the near head-on collision. The trial court found John, SCB, and the Police Jury each one-third at fault and awarded damages. The Police Jury appeals.[1] After reviewing the record, we reduce the percentage of fault of the Police Jury from one-third to twenty percent, SCB's percentage of fault is affirmed, and the remaining fault is assessed to John.

FACTS
While traveling to the town of Eunice on August 1, 1989, the Bellards were involved in a near head-on collision on Perchville Road. Perchville Road is a two-lane, blacktop road which travels through a heavily wooded area of Acadia Parish. The road contains three successive bridges and has a posted speed limit of forty-five miles per hour. The accident at issue occurred on the middle bridge. John testified that after rounding a curve in the road, he saw an SCB truck proceeding *699 down the center of bridge. The SCB truck was driven by Russell Quibodeaux, an SCB employee. In response to what he perceived to be an emergency situation, John applied his brakes causing them to lock and his vehicle to slide four feet into the oncoming lane of traffic, striking the SCB truck. However, prior to the collision, the SCB truck was able to maneuver towards the right and stop within a foot of the vegetation growing along the bridge railing. Despite this maneuvering, the truck still remained slightly in the center of the road. As a result of the accident, Jennifer, who was eight months pregnant, sustained multiple injuries, including a broken hand and leg, a fractured right hip, and the stillbirth of her child. John and Nicholas sustained only minor injuries.
The Bellards filed suit against the Police Jury, contending that Perchville Road was defective rendering it unreasonably dangerous, and against SCB, contending that its employee/agent was negligent in driving down the center of the bridge, and that these were each a cause-in-fact of the accident. Numerous third-party demands and cross-claims were filed by the parties; however, prior to trial, all claims against John and his insurer, State Farm Mutual Automobile Insurance Company, were settled.
On June 27, 1995, a bench trial on the merits was held and then the matter was taken under advisement. A judgment was rendered by the trial court without written reasons on December 15, 1995, finding John, SCB, and the Police Jury each one-third at fault in causing the accident and awarding the Bellards $200,000.00 in general damages and $30,000.00 in medical expenses. Motions for a new trial were timely filed by the Bellards and SCB, both of which were granted. After considering the briefs submitted by all parties, the trial court set aside the original judgment and rendered judgment still finding John, SCB, and the Police Jury each one-third at fault. However, the trial court increased Jennifer's damages award to $755,000.00, reduced by one-third because of the settlement between John and his insurer, and increased her award for past medical expenses to $60,949.77, which was not subject to reduction. The trial court also awarded John the sum of $95,500.00 in general damages to be reduced by the percentage of his comparative fault.

ISSUES
The Police Jury asserts eight assignments of error on appeal:
1) The trial court erred in finding the Police Jury one-third at fault.
2) The trial court abused its discretion in awarding $565,000.00 in general damages to Jennifer.
3) The trial court erred in awarding Jennifer and John each $65,000.00 in damages for the loss of their eight-month old fetus.
4) The trial court erred in awarding Jennifer damages in the amount of $45,000.00 for loss of earning capacity.
5) The trial court erred in awarding Jennifer damages in the amount of $20,000.00 for loss of consortium.
6) The trial court erred in awarding John damages in the amount of $25,000.00 for loss of consortium.
7) The trial court erred in failing to reduce the award of damages to Jennifer for past medicals due to the settlement and release of John and his insurer.
8) The trial court erred in casting the Police Jury with fifty percent of the costs and in failing to express court costs with a dollar amount as required by La.R.S. 13:5112(A).

FAULT
The Police Jury initially asserts that the trial court erred in finding it one-third at fault. In brief, the Police Jury specifically argues that the record does not establish an unreasonably dangerous condition and, further, that the Bellards failed to establish actual or constructive knowledge on the part of the Police Jury. The Bellards contend that the condition of Perchville Road was unreasonably dangerous due to the excessive vegetation and a pine tree in the road right-of-way that impeded John's vision as he rounded a curve south of the bridge, the bridge's inadequate width, and the lack of warning signs on the road.
*700 It is well settled that a parish owes a duty to maintain the roads in its custody and control in a reasonably safe condition. Carroll v. Evangeline Parish Police Jury, 94-1138 (La.App. 3 Cir. 3/1/95); 651 So.2d 424, writ denied, 95-806 (La.5/5/95); 654 So.2d 329. However, this duty does not require the parish to be an insurer of travelers on its roads, but, instead, requires the road to be in a reasonably safe condition so that prudent and careful drivers will not be exposed to injury. Hasha v. Calcasieu Parish Police Jury, 94-705 (La.App. 3 Cir. 2/15/95); 651 So.2d 865, writs denied, 95-667, 95-676 (La.4/28/95); 653 So.2d 592, 593; Pitts v. Bailes, 551 So.2d 1363 (La.App. 3 Cir.), writ denied, 553 So.2d 860 (La.1989), writ denied, 556 So.2d 1262 (La.1990). Additionally, the Louisiana legislature has placed the responsibility on parish authorities to maintain traffic control devices upon highways within its jurisdiction. See La.R.S. 32:235(B).
This responsibility is the basis of a legal duty to the public.
Because of this responsibility, the police jury has the legal duty to erect warning signs sufficient to warn motorists of hazardous conditions. McCoy v. Franklin Parish Police Jury, [414 So.2d 1369 (La. App. 2d Cir.1982) ]. The failure to so warn subjects the parish to liability for damages resulting from the breach of that duty.
Carroll, 651 So.2d at 426, citing Langer v. Bienville Parish Police Jury, 541 So.2d 360, 362 (La.App. 2d Cir.), writ denied, 546 So.2d 177 (La.1989). However, liability hinges on the parish having actual or constructive knowledge of the existence of the hazardous or unreasonably dangerous condition. A determination of whether the parish has breached its duty will depend on the facts and circumstances present in each case. Manasco v. Poplus, 530 So.2d 548 (La.1988).
Whether damages are sought under a theory of negligence or strict liability, the elements to be proven by a plaintiff before he/she can recover from a government defendant based on a defective condition of a roadway are the same. La.Civ.Code art. 2315;[2] La.Civ.Code art. 2317;[3] La.R.S. 9:2800;[4]Ryland v. Liberty Lloyds Ins. Co., 93-1712 (La.1/14/94); 630 So.2d 1289. A plaintiff must prove that: (1) the defendant owned or had custody of the thing which caused the damage; (2) the thing was defective in that it created an unreasonable risk of harm to others; (3) the defendant had actual or constructive knowledge of the defect and failed to take corrective actions within a reasonable time; and (4) the defect was a cause-in-fact of the accident. Faulkner v. State, Dep't of Transp. & Dev., 25,857, 25,858 (La. 2 Cir. 10/26/94), 645 So.2d 268, writs denied, 94-2901, 94-2908 (La.1/27/95); 649 So.2d 390; Newsom v. State, Dep't of Transp. & Dev., 93-815 (La.App. 3 Cir. 3/30/94); 640 So.2d 374, writ denied, 94-1118 (La.6/24/95); 641 So.2d 207.
It is undisputed that Perchville Road was under the jurisdiction of the Police Jury. Likewise, several other key facts are not disputed, such as: (1) the bridge measured 18'7" from rail to rail, but the actual roadway of the bridge measured 16'9"; (2) vegetation *701 was present along the side of the bridge yielding the appearance that it really measured 14'10" rather than 16'9"; (3) the SCB truck measured 8'2½" wide and the Bellards' 1979 Ford Thunderbird measured 6'6½" wide; (4) at the point of initial braking, the skid marks evidenced that the SCB truck was over the center of the road, while the Bellards' vehicle was inside their proper lane of traffic; (5) prior to impact, the SCB truck had maneuvered to within ten to twelve inches of the vegetation growing along the bridge railway, while the Bellards' vehicle traveled four feet inside SCB's lane of traffic; (6) both drivers had treated the bridge as a one-lane bridge in the past; (7) SCB's truck was on the bridge before the Bellards' vehicle rounded the curve situated just south of the bridge; (8) the two vehicles could have successfully passed on the bridge; and (9) a pine tree, measuring approximately three feet in diameter and located approximately five feet off the traveled portion of the road and approximately seventy feet from the southern entrance to the bridge, restricted John's vision as he negotiated the curve just prior to reaching the tree.
Robert Lipp, an expert in accident reconstruction, testified that he believed the cause of the accident was: (1) both drivers were driving at an excessive speed for the conditions (prior to braking, SCB was traveling approximately thirty-three miles per hour and John was traveling thirty-eight miles per hour); (2) the pine tree restricted the vision of the northbound driver (John); (3) the narrowness of the bridge; (4) the lack of warning signs (i.e. reduced speed, curve, and narrow bridge signs); and (5) the fact that the SCB truck was traveling down the center of the road. Lipp described the location as a "very dangerous situation because of the fact that the bridge is so narrow and the visibility to get to the bridge is quite restricted." Although Lipp testified that the bridge measured 18'7" from rail to rail, he stated that the width of the road measured 16'9", and that the measurement across the bridge from vegetation to vegetation was 14'10". He testified that the vegetation along the sides of the bridge would lead an approaching driver to believe that not all of the space on the bridge was usable. In fact, he testified that at some spots along the bridge the timbers constituting the bed of the bridge showed through the asphalt. Lipp opined that travel on the road should have been restricted to twenty-five miles per hour. He did admit that the two vehicles could have successfully passed on the bridge, and that John's vehicle slid into the oncoming lane of traffic as a result of his brakes locking on the tangent of the curve.
Raymond Buckhart, SCB's expert in accident reconstruction, testified that the cause of the accident was either John's excessive speed or inattention. He further testified that, after studying the skid marks produced by the Bellards' vehicle, he was of the opinion that although it had rained earlier in the day the road was dry at the time of the accident. Buckhart explained that the roadway or the aggregate on top of the roadway must have been dry to produce skid marks of the clarity presented. Also, unlike Lipp, Buckhart opined that "back near the tree area, there was a steering maneuver to the right by ... Bellard ... [and that] he was approaching the railing, the apron railing, and executed a left maneuver to get back on the travel portion of the roadway and locked up his brakes." Buckhart supported this proposition by examining the results of a skid test which indicated that the curve was a "dog-leg curve" rather than an "elbow type curve." Burkhart continued that the road straightens out after the driver passes the tree and, therefore, "if you would lock up your brakes, you would tend to skid in a straight direction ... [and] slide straight down the main span of the bridge." It was Burkhart's opinion that the Bellards' vehicle ended up in SCB's lane of traffic because John over-corrected to the left "to get back on the travel portion of the roadway and locked up his brakes." With regard to the surroundings, Burkhart testified that the pine tree momentarily restricted the northbound driver's view, but that "[t]he basic problem with the bridge is the perception as one approaches the bridge that its narrower than what it really is...." Lastly, Burkhart opined that the absence of a narrow bridge and/or reduced speed sign were not causative factors in this accident because both drivers *702 were aware of the condition of the bridge and its surroundings.
The trial court, in holding the Police Jury one-third at fault, found Perchville Road unreasonably dangerous because the Police Jury "was negligent in failing to remove the pine tree and cut and maintain all weeds and underbrush along its road right-of-way. Additionally, the Police Jury was negligent in failing to post `curve,' `narrow bridge' or any advisory speed reduction signs for either vehicle as they approached the accident location." The trial court further found that "[i]t appears from the photographs and video tape that this accident would not have happened if the Parish had properly maintained the road right-of-way; this, together with a lack of proper signing thereof and maintaining a narrow bridge waiting for an accident to happen." Finally, the trial court found that both experts had agreed that twenty-five miles per hour would be a safe speed for the bridge.
Although the trial court failed to specifically address each element the Bellards were required to prove, we are unable to say that the trial court erred in finding the Police Jury at fault. As we have already stated, it is undisputed that the Police Jury had jurisdiction over Perchville Road. The trial court further found that the bridge presented an unreasonable risk of danger due to the Police Jury's failure to remove the pine tree and the vegetation along the bridge and its failure to post warning signs or reduced speed signs in either direction approaching the bridge.
On the issue of whether the Police Jury had actual or constructive knowledge of an unreasonably dangerous condition which would render it liable for damages, the Bellards offered no affirmative evidence. However, "[o]ne is presumed to have constructive knowledge of a defect or dangerous condition when it is shown it existed for such a long time that knowledge thereof can be presumed, or that it can be said that one should have had knowledge of the condition." Briggs v. Hartford Ins. Co., 517 So.2d 1173, 1176 (La.App. 3 Cir.1987), writ granted, 521 So.2d 1160(La.), affirmed in part; reversed in part and amended, 532 So.2d 1154 (La. 1988). In this instance, the trial court obviously decided after observing the photographs and the video tape of the accident location that the conditions which rendered the bridge unreasonably dangerous had been in existence for such a length of time that the Police Jury should have known of their existence. Further, both John and Quibodeaux testified that they had treated the bridge as a one-lane bridge in the past due to the bridge's narrowness and the location of the pine tree and vegetation. The size of the pine tree affirms that it was present at that location long before the accident occurred, thus, the Police Jury must have known of its existence. In addition, both experts testified that the pine tree obscured John's vision as he approached the bridge and that a safe speed for this road would have been twenty-five miles per hour. For these reasons, we find no error in the trial court's determination that the Police Jury was at fault because of the unreasonably dangerous condition of the bridge and roadway.
Although the trial court did not err in its determination of fault, we do find error with the percentage of fault allocated to the Police Jury. Once an appellate court has found a "clearly wrong" apportionment of fault, it should only adjust the award to the extent of raising it or lowering it to the highest or lowest point reasonably within the trial court's discretion. Clement v. Frey, 95-1119, 95-1163 (La.1/16/96); 666 So.2d 607. In Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967, 974 (La.1985), the supreme court stated:
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm *703 to the plaintiff are considerations in determining the relative fault of the parties.
Although the Police Jury was responsible for maintaining Perchville Road in a safe manner, John admitted that he was very familiar with this stretch of road and, as stated above, he testified that he always treated the bridge as a one-lane bridge. John testified that he was unsure how fast he was traveling prior to the accident; Lipp estimated his speed at forty-one miles per hour prior to braking. Only Nicholas was wearing his seat belt, and Jennifer was eight months pregnant. Under the circumstances of this case, we find that the greater percentage of fault should be attributed to John and SCB than to the Police Jury. John was familiar with Perchville Road, he knew that his view would be restricted by the pine tree as he approached the bridge, and he knew that it had rained that morning; thus, he should have approached the bridge with greater caution until he was sure that no other vehicle was on the bridge. Although Quibodeaux was traveling down the center of the bridge in the SCB truck, both experts testified that there was sufficient room on the bridge for both vehicles to pass. Had John been traveling at a slower speed, the accident could have been avoided. Under Clement, 666 So.2d 607, we find that the highest percentage of fault the trial court could assign to the Police Jury is twenty percent. The remainder of the fault, forty-six and two-thirds percent, is hereby assigned to John. The judgment of the trial court is amended accordingly.

GENERAL DAMAGES
In its second assignment of error, the Police Jury argues that the trial court erred in awarding Jennifer $565,000.00 in general damages. Before an appellate court will disturb an award of damages on appeal, the record must clearly reveal that the trier of fact abused its discretion in making the award. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). In order to determine whether an abuse of discretion has occurred, we must first look to the individual circumstances of the injured plaintiff. Reck v. Stevens, 373 So.2d 498 (La.1979).
Following the accident, Jennifer was transported by ambulance to Moosa Memorial Hospital in Eunice, where she was treated by Drs. Rodney Landreneau, A. C. Miller, Phillip Bellow, Frank Anders, Douglas McKay, and John Lassere. An emergency cesarean section was immediately performed by Drs. Bellow and Landreneau when efforts to locate a fetal heartbeat failed. The fetus was dead upon removal due to the premature detachment of the placenta from the uterus. In addition to the death of her child, Jennifer suffered a ruptured peritoneum, a ruptured uterus, a contused abdominal wall, massive internal abdominal hemorrhaging, an open fracture of the left tibia and fibula, a comminuted fracture of the right acetabulum or hip joint, a left sacral fracture involving the S1 joint with a fracture of the pedicle and transverse process of the S1, contused kidneys, multiple lacerations of the face, including a laceration of the sclera or whitish portion of the left eye, a laceration of the right elbow, and comminuted fractures of the third and fourth metacarpals of the left hand. In addition to the cesarean section, Dr. Bellow repaired Jennifer's uterus and then Dr. Landreneau performed an abdominal exploration, reduction of the right acetabulum fracture, as well as irrigation and reduction of the left open tibia and fibula fractures. A mid-thigh length cast was placed on Jennifer's left leg to stabilize her fractures. During these procedures, she received transfusions of nine units of packed red blood cells, twenty units of platelets, twenty units of cryoprecipitate, and four units of fresh frozen plasma. Following surgery, Jennifer was transferred to the intensive care unit where she remained until August 11, 1989. Her right leg was placed in traction since the acetabulum was broken into so many fragments that Dr. McKay did not feel he could realign them through surgery. On August 17, 1989, Dr. Anders performed an open reduction and internal fixation of the third and fourth metacarpal fractures on Jennifer's left hand. Pins were placed in her hand, which extended through the skin so that they could be removed at a later date without surgery.
In addition to her injuries and the procedures performed, Jennifer suffered from *704 post-operative ileus (obstruction of the intestines), reaction to the blood transfusions, acute respiratory distress caused by her lungs filling up with protein and enzyme debris from her injuries, pulmonary embolism (blood clots), pulmonary edema, and sciatic pain. Prior to surgery, Dr. Landreneau described Jennifer's condition as impending death; following surgery he stated that she was still critically ill and she was suffering from impending pulmonary failure due to volume overload. By August 7, 1989, Dr. Lassere testified that Jennifer's condition was much improved. However, Jennifer developed a kidney infection towards the end of her hospital stay which required her to remain in the hospital an additional five days. She was finally released from the hospital on August 28, 1989.
Following her release, Jennifer was restricted to bed rest for approximately two months. She remained in traction for approximately six weeks and received physical therapy for a total of thirteen months following the accident. Her long leg cast was removed in December 1989 and replaced with a short leg cast, which was removed in January 1990. At that time, Jennifer was able to start bearing weight on both of her legs. Dr. McKay testified that Jennifer's right limb is approximately one centimeter shorter than her left limb due to her hip fracture and, as a result, she walks with a slight limp. He testified that she suffers from traumatic arthritis in her right hip, which he stated would progressively worsen until at some point she would require a total hip replacement or arthroplasty. Dr. McKay predicted that, due to her age and depending upon the technology available, Jennifer might possibly require a replacement of the replacement hip. Dr. McKay assigned Jennifer with a fifteen percent total disability and stated that as her condition worsened this percentage would increase slightly, but it should decrease after her hip is replaced. As of November 1994 and June 1995, Jennifer was complaining of pain in her knees, ankles, and lower back. Although he was unable to determine the cause of this pain, Dr. McKay felt that it was due to Jennifer favoring her right side because of her hip. Jennifer testified that she suffers from back, hip, and leg pain. Following the accident, she enrolled in a nursing course at Louisiana State University-Eunice and obtained her degree in May 1995. She stated that she suffered much pain while completing the clinical portion of her nursing curriculum.
After considering the evidence, we find no error in the trial court's award of $565,000.00 in general damages. Taking into account the extent of Jennifer's numerous injuries, the duration of her recovery, the fact that the arthritis in her hip will worsen, and the possibility that she will require two future hip replacements, we find that the amount awarded by the trial court was well within the amount which a reasonable trier of fact could assess under the circumstances of this case. The trial court's award of general damages is affirmed, and the Police Jury's assignment of error is dismissed.

LOSS OF FETUS
In its third assignment of error, the Police Jury asserts that the trial court erred in awarding both Jennifer and John $65,000.00 for the loss of their eight and a half month old fetus. In support, the Police Jury directs our attention to the fact that the Bellards had another child subsequent to the death of the fetus at issue, and they cite three cases where the damage awards ranged from $10,000.00 to $40,000.00 per parent. However, as a panel of this court stated in Wartell v. Woman's and Children's Hosp., Inc., 95-736 (La.App. 3 Cir. 5/22/96); 676 So.2d 632, on rehearing, 95-736 (La.App. 3 Cir. 2/19/97); 690 So.2d 856:
Our role as an appellate court in reviewing general damages is not to decide what we consider to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. "Each case is different, and the adequacy or inadequacy of the award should be determined by the facts or circumstances particular to the case under consideration." Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
In the case sub judice, the trial court awarded $65,000.00 to each parent for *705 the loss of their fetus. After reviewing the record, we find no error in this award considering the fact that Jennifer's pregnancy had progressed normally, she was at the very least fifteen days from delivery, and the anticipation both parents felt towards the coming birth of their daughter. The fact that Jennifer has since given birth to a second son has no bearing on this award and does not replace the loss of the fetus. Thus, we affirm the trial court's award of $65,000.00 to each parent.

LOSS OF EARNING CAPACITY
In its fourth assignment of error, the Police Jury argues that the trial court erred in awarding Jennifer $45,000.00 for loss of earning capacity. It argues that because Jennifer has since earned a degree in nursing she has increased her earning capacity instead of suffering a loss, thus, the trial court's award is unsupported by the record.
In Batiste v. New Hampshire Ins. Co., 94-1467 (La.App. 3 Cir. 5/3/95); 657 So.2d 168, 170, writ denied, 95-1413 (La.9/22/95); 660 So.2d 472, the court explained:
Loss of earning capacity is not the same as lost wages. Rather, earning capacity refers to a person's potential. Earning capacity is not necessarily determined by actual loss. While the plaintiff's earnings at the time of the accident may be relevant, such figures are not necessarily indicative of his past or future lost earning capacity. The plaintiff need not be working or even in a certain profession to recover this type of award. What is being compensated is the plaintiff's lost ability to earn a certain amount, and he may recover such damages even though he may never have seen fit to take advantage of that capacity. Hobgood v. Aucoin, 574 So.2d 344 (La.1990).
In determining whether a personal injury plaintiff is entitled to recover for the loss of earning capacity, the trial court should consider whether and how much plaintiff's current condition disadvantages him in the work force. The trial court should thus ask itself what plaintiff might be able to have earned but for his injuries and what he may now earn given his resulting condition. Finnie v. Vallee, 620 So.2d 897 (La.App. 4 Cir.), writ denied, 625 So.2d 1040 (La.1993).
The very nature of lost earning capacity makes it impossible to measure the loss with any kind of mathematical certainty. The facts of each case must take into account a variety of factors, including the plaintiff's condition prior to the accident, his work record prior to the and after the accident, his previous earnings, the likelihood of his ability to earn a certain amount but for the accident, the amount of work life remaining, inflation, and the plaintiff's employment opportunities before and after the accident. Finnie, 620 So.2d at 901.
A trial court's award for loss of earning capacity is reviewed under the manifest error standard of review. Detraz v. Hartford Accident and Indem. Co., 94-708 (La.App. 3 Cir. 12/7/94); 647 So.2d 576. The issue is not whether a different award may have been more appropriate, but whether the trial court's award is reasonably supported by the record. Id.
At the time of the accident, Jennifer was twenty-two years old. After completing high school, she had enrolled in an accounting course at the T.H. Harris Vocational Technical School in Opelousas in the fall of 1985. She finished this course in July 1989, after an interruption to have her first child. Following the accident, Jennifer worked as a secretary/receptionist for six months until she was laid off due a to lack of work, earning between $4.50 and $5.00 per hour. She was next employed as a receptionist for a dentist from January 1991 until July 1991, earning between $4.25 and $4.50 per hour. This employment ended when she took maternity leave to have her second child. In June 1992, Jennifer enrolled in a pre-nursing program at Louisiana State University-Eunice, and then enrolled in the nursing program in August 1993, completing the curriculum in May 1995. At the time of the trial, she was waiting to take the State boards to obtain her nursing license.
Shirley Dickie, a certified rehabilitation counselor, evaluated Jennifer on May 23-24, *706 1994 and June 6, 1995. Following the May 23-24, 1994 evaluation, Dickie concluded that Jennifer's complaints of hip and low back pain would limit her to sedentary work where she could sit, stand, or move as needed. She determined that lifting and prolonged standing would either aggravate or exacerbate Jennifer's hip problem. Dickie reported that Jennifer, because of her orthopedic problems, had been somewhat unrealistic in pursuing a nursing degree, however, she felt that Jennifer had the capacity to pursue a further college degree. Dickie concluded that "[w]ith a college education and a specific skill, Ms. Bellard would definitely increase her wage-earning capacity, as well as the number of jobs available to her. I would recommend that she seriously consider the categories of jobs identified in this report and consider a change in her college degree."
On June 6, 1995, Jennifer told Dickie that she had obtained an associate degree in nursing and was waiting to take the examination to be licensed. After this evaluation, Dickie reported that she felt that Jennifer would pass her boards and become a registered nurse. However, she feared that the disability and limitations resulting from Jennifer's injuries would prevent her from working a forty-hour week and, thus, she should consider working a twenty-hour or less work week. Dickie determined that Jennifer would be capable of earning between $13.00 and $15.50 per hour as a licensed nurse, but, if unable to pursue a nursing career, then Jennifer would only be able to earn between $4.25 and $7.50 per hour based on her geographic living area. Dickie determined that Jennifer's primary problem was her lack of experience in accounting and business office areas and, as a result, felt that she would have difficulty in obtaining a higher paying position.
Karen Keller, a certified rehabilitation counselor, evaluated Jennifer on May 16, 1995, at the request of SCB. Keller determined that, based on Dr. McKay's medical prognosis that Jennifer's functional abilities would greatly improve once she had the hip arthroplasty, Jennifer would be capable of functioning in a nursing program. She found that Jennifer had increased her wage earning potential and the positions available to her by obtaining her nursing degree. As a nurse, Keller stated that Jennifer had the potential to earn approximately $15.00 per hour.
Dr. McKay felt that Jennifer would have trouble performing her duties as a nurse, especially positions requiring a lot of walking, standing, bending, and lifting, but he predicted that she should do better after her hip replacement. Even if she had the hip replacement, Dr. McKay stated that he would discourage Jennifer from performing physical activities where she would run the risk of loosening up the hip joint.
In awarding $45,000.00 for loss of earning capacity and/or diminution in earning capacity, the trial court merely stated that "[i]t appears clear that Ms. Bellard has suffered" such a loss. In reviewing the evidence, we find that the record clearly supports a finding that Jennifer suffers from a residual disability causally related to the accident on August 1, 1989. Although we find that Jennifer has improved her earning capacity through obtainment of a nursing degree, there is still evidence that the disability in her right hip will result in a loss of earning capacity even if she works in that field. As Dickie stated, it appears uncertain whether Jennifer will be able to work a full forty-hour week or perform the duties required of her without aid or assistance. The alternative positions pointed out by both Dickie and Keller all begin at a range lower than that offered in an entry level nursing position. As in Hobgood v. Aucoin, 574 So.2d 344 (La.1990), we find little evidence in the record which would help us determine whether the trial court's award of $45,000.00 was appropriate. "Here, the loss of earning capacity, although proved in a general sense, is highly speculative as to value or amount." Id. at 348. Since we have little evidence on this issue, and given the trial court's vast discretion in awarding damages, we find no manifest error in the trial court's award of $45,000.00.

LOSS OF CONSORTIUM
In its fifth and sixth assignments of error, the Police Jury argues that the trial court erred in awarding Jennifer $20,000.00 and *707 John $25,000.00 in damages for loss of consortium.
In order to prove a claim for loss of consortium, a plaintiff must prove three things: (1) the liability of the defendant, (2) his or her spouse's damages, and (3) his or her consequent loss of consortium damages. Peck v. Wal-Mart Stores, Inc., 96-645 (La. App. 3 Cir. 11/6/96); 682 So.2d 974. Loss of consortium is more than just a loss of general overall happiness, it also includes love and affection, society and companionship, sexual relations, the right of performance of material services, the right of support, aid, and assistance, and felicity. Detraz, 647 So.2d 576. The trier of fact is given much discretion in awards for loss of consortium and will not be overturned on appeal in the absence of manifest error. Doucet v. Doug Ashy Bldg. Materials, Inc., 95-1159 (La.App. 3 Cir. 4/3/96); 671 So.2d 1148; Lonthier v. Northwest Ins. Co., 497 So.2d 774 (La.App. 3 Cir.1986).
After reviewing the record, we find the trial court erred in awarding Jennifer damages for loss of consortium; however, we find no error in its award to John. There is no evidence in the record that John suffered injures as a result of this accident for which Jennifer suffered a loss of consortium. Any loss that she might have suffered for which she is owed damages has been recovered through her general damages award.
John's situation, however, is a different matter. He testified that Jennifer was helpless after being released from the hospital. She was bedridden for approximately two months, and then progressed from a wheelchair, to a walker, and then to crutches. She was unable to move without his assistance. During her recovery, he cared for their son. John testified that before the accident Jennifer did all of the housework, but since then he helps her as much as possible because vacuuming, mopping, or standing too long is painful to her. After the birth of their second child, John testified that Jennifer could do some things for the baby as long as she was standing or sitting on the floor; however, she was unable to do things such as bathe the child because she could not kneel due to her hip. Prior to the accident, John testified that Jennifer would ride horses, ride in the truck and look at the crops, go dancing, and wrestle on the floor with him. Now, she is either unable to do these activities or her participation in them is severely hindered. In his deposition, John testified that Jennifer complained of pain in her hip at least five days a week following her recovery.
John stated that the physical problems Jennifer suffers as a result of the accident has affected their personal life. He stated that her pain overruns their private life and puts a damper on everything they do. Taking this evidence into consideration, we cannot say that the trial court abused its vast discretion in awarding John $25,000.00 in damages for loss of consortium. The judgment of the trial court is affirmed with respect to John but is reversed as to Jennifer.

REDUCTION OF PAST MEDICALS
In its seventh assignment of error, the Police Jury contends that the trial court erred in failing to reduce the damages for past medical expenses awarded to Jennifer by the percentage of fault attributed to John, since he and his insurer settled prior to trial. Following the rehearing, the trial court awarded Jennifer the amount stipulated by the parties, $60,949.77, for past medical expenses but held that it was not subject to diminution because of John's fault. The Bellards argue that the trial court intended Jennifer to receive the whole amount because she was not at fault in causing the accident.
In Cavalier v. Cain's Hydrostatic Testing, Inc., 94-1496 (La.6/30/95); 657 So.2d 975, 981, the supreme court stated:
Louisiana has long recognized that since the tort victim's release of one tortfeasor deprives the remaining tortfeasors of their contribution rights against the settling tortfeasor, the tort victim's recovery must be reduced by the proportionate share of the settling tortfeasor. See Harvey v. Travelers Ins. Co., 163 So.2d 915 (La.App. 3d Cir.1964); Dill v. State, Dept. Of Transp. and Dev., 545 So.2d 994 (La.1989). Therefore, quantification of the fault of a settling tortfeasor is not only appropriate, but is necessary, whether that tortfeasor is *708 a party and has been dismissed from the action or whether the settlement occurred before the tortfeasor was ever made a party.
(Footnote omitted). We find that the trial court erred by not reducing the amount awarded to Jennifer for past medical expenses by the percentage of fault attributable to John, a settling tortfeasor. Because we have increased John's percentage of fault from one-third to forty-six and two-thirds percent, Jennifer's award for past medicals is reduced from $60,949.77 to $32,504.51. The trial court's judgment is amended to reflect the amount awarded.

COURT COSTS
In its final assignment of error, the Police Jury argues that the trial court erred in casting it with fifty percent of the court costs, and in failing to express the court cost with a dollar amount as required by La.R.S. 13:5112(A).
A trial court is given great discretion in taxing court costs in any manner that it deems equitable. La.Code Civ.P. art. 1920. It is the general rule that a party cast in judgment is taxed with the cost of the proceedings. However, the trial court may assess costs in any equitable manner and its assessment will not be reversed on appeal in the absence of an abuse of discretion. Este' v. State Farm Ins. Co., 96-99 (La.App. 3 Cir. 7/10/96); 676 So.2d 850. In this instance, the trial court cast the Police Jury and SCB each with fifty percent of the court costs. In light of the fact that the trial court found John at fault in causing the accident, we find that the trial court abused its discretion by not allocating a portion of the court costs to him. We find that a more equitable assessment would be to cast each party with a percentage of cost equal to their fault. Thus, the Police Jury is assessed with twenty percent of the court costs, SCB is assessed with one-third of the court cost, and John is assessed with the remaining court cost. In accordance with La.R.S. 13:5112(A), the Police Jury is assessed with court costs in the amount of $2,229.74. The judgment of the trial court is amended accordingly.

CONCLUSION
For the foregoing reasons, the judgment of the trial court awarding the plaintiff-appellee, Jennifer Bellard, damages for loss of consortium is reversed. The trial court's judgment is amended to reflect that the percentage of fault allocated to the defendant-appellant, Acadia Parish Police Jury, is decreased from one-third to twenty percent; the fault allocated to South Central Bell Telephone Company is affirmed and remains at one-third; and the remaining fault, forty-six and two-thirds percent, is allocated to plaintiff-appellee, John Bellard. The judgment of the trial court is further amended to reflect that the damage award to Jennifer for past medical expenses is reduced by forty-six and two-thirds percent, for the fault attributed to John as a settling tortfeasor. Finally, the judgment of the trial court is amended to reflect that court costs are assessed to each party in an amount consistent with their percentage of fault, and the Police Jury is assessed with court costs in the amount of $2,229.74. In all other respects, the judgment of the trial court is affirmed.
AFFIRMED AS AMENDED; AND REVERSED.
AMY, J., dissents and assigns reasons.
AMY, Judge, dissenting.
In my opinion, this case turns on the language of La.R.S. 9:2800, which provides in part:
B. Except as provided for in ... this Section, no person shall have a cause of action based solely upon liability imposed under Civil Code Article 2317 against a public entity for damages caused by the condition of things within its care and custody unless the public entity had actual or constructive notice of the particular vice or defect which caused the damage prior to the occurrence, and the public entity has had a reasonable opportunity to remedy the defect and has failed to do so.
C. Constructive notice shall mean the existence of facts which infer actual knowledge.

*709 (Emphasis added).
Therefore, liability of the Acadia Parish Police Jury hinges on the parish having actual or constructive notice of the existence an unreasonably dangerous condition. Prior to the enactment of La.R.S. 9:2800, when damages were sought against a government defendant under the theory of strict liability, knowledge of the defective condition was presumed. La.Civ.Code art. 2317. However, since the enactment of 9:2800, a plaintiff must prove that the government defendant had actual or constructive notice of the defective condition.
In my view, the record before us does not support the finding that the Bellards offered sufficient proof that the parish had the requisite notice, actual or imputed, of a defective condition. The Bellards offered no affirmative evidence that the parish had actual or constructive notice of an unreasonably dangerous condition which would render them liable for damages. To the contrary, all evidence presented supports the proposition that the parish did not have actual or constructive notice of the presence of any vice or defect. It is the Bellards' failure to prove by a preponderance of the evidence all elements for entitlement to recover damages, including specifically that the parish had actual or constructive notice of a defect or risk of harm and failed to take corrective action within a reasonable time, which mandates the reversal of the trial court's judgment. Without proof of this element, recovery is barred under either a theory of negligence or strict liability. Accordingly, I conclude that the trial court erred in finding the Acadia Parish Police Jury liable for any of the Bellards' damages.
I respectfully dissent.
NOTES
[1] SCB also appealed, but entered into a settlement agreement prior to the rendition of this opinion. Accordingly, SCB's appeal is moot and we will not consider the merits of SCB's assignment of errors. We also note that prior to trial, all claims against John Bellard and his insurer were settled and dismissed.
[2] La.Civ.Code art. 2315 provides:

Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.
Damages may include loss of consortium, service, and society, and shall be recoverable by the same respective categories of persons who would have had a cause of action for wrongful death of an injured person.
[3] La.Civ.Code art. 2317 provides:

We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. This, however, is to be understood with the following modifications.
[4] La.R.S. 9:2800 provides in pertinent part:

A. A public entity is responsible under Civil Code Article 2317 for damages caused by the condition of buildings within its care and custody.
B. Except as provided for in Subsection A of this Section, no person shall have a cause of action based solely upon liability imposed under Civil Code Article 2317 against a public entity for damages caused by the condition of things within its care and custody unless the public entity had actual or constructive notice of the particular vice or defect which caused the damage prior to the occurrence, and the public entity has had a reasonable opportunity to remedy the defect and has failed to do so.
C. Constructive notice shall mean the existence of facts which infer actual knowledge.