# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 03-349


KLINT L. FRUGE

VERSUS

HEBERT OILFIELD
CONSTRUCTION, INC., ET AL.


************

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT,
PARISH OF ST. LANDRY, NO. 00-3250,
HONORABLE JAMES T. GENOVESE, DISTRICT JUDGE

************

## MICHAEL G. SULLIVAN
## JUDGE

************

Court composed of Oswald A. Decuir, Michael G. Sullivan, and Elizabeth A. Pickett, Judges.


**AFFIRMED.**


M. Terrance Hoychick
Young, Hoyhick & Aguillard
Post Office Drawer 391
Eunice, Louisiana  70535-0391
(337) 457-9331
Counsel for Plaintiff/Appellee:
    Klint Fruge

John W. Johnson
Clanton & Johnson
Post Office Box 688
Eunice, Louisiana  70535-0688
(337) 457-3365
Counsel for Plaintiff/Appellee:
    Klint Fruge

**Dave T. Johnson**
**Attorney at Law**
**405 West Main Street, Suite 108**
**Lafayette, Louisiana 70501**
**(337) 593-0120**
**Counsel for Plaintiff/Appellee:**
**Klint Fruge**

**James Ryan III**
**James Ryan III & Associates, LLC**
**201 St. Charles Avenue, Suite 2530**
**New Orleans, Louisiana 70170-2530**
**(504) 599-5990**
**Counsel for Defendants/Appellants:**
**AXA Global Risks U.S. Insurance Company**
**Raul Chavez**
**Hebert Oilfield Construction, Inc.**

SULLIVAN, Judge.

Klint Fruge filed suit for personal injuries allegedly sustained in an automobile accident, naming as Defendants the other driver and his employer, Raul Chavez and Hebert Oilfield Construction, Inc., and their insurer, AXA Global Risks U. S. Insurance Company. After a bench trial in which Mr. Chavez was found to be 100% at fault, Mr. Fruge was awarded $11,745.61 in stipulated medical expenses; $2,315.70 in past lost wages; $100,000.00 in general damages; and $90,000.00 in loss of earning capacity. On appeal, Defendants argue that Mr. Fruge did not prove a loss of earning capacity, or alternatively, that the amount awarded for those damages is excessive, given that he has been retrained and now earns more than he did prior to the accident. For the following reasons, we find no error and affirm.

## Discussion of the Record

The accident occurred on August 27, 1999, when Mr. Fruge, then 21, broadsided a truck driven by Mr. Chavez, who failed to stop at a flashing red light. About three hours after the accident, Mr. Fruge went to a hospital emergency room with complaints of low back pain that radiated through the legs. He was referred to Dr. Louis Blanda, an orthopedic specialist, after the results of an MRI revealed degenerative disc disease and a small herniation at L5-S1.

Dr. Blanda treated Mr. Fruge conservatively through September of 2002, during which time he complained of stiffness and pain in the low back, numbness and pain in the right leg, particularly after sitting too long, and a slight weakness in the right foot. In addition to prescribing pain and anti-inflammatory medication, Dr. Blanda ordered a course of physical therapy, which Mr. Fruge said reduced his pain by 60-70% after five months of treatment. Dr. Blanda believed Mr. Fruge's symptoms were consistent with a small L5-S1 herniation, for which he assigned a

10% anatomical impairment of the body as a whole. Because he did not diagnose a neurological deficit, Dr. Blanda did not recommend surgery. However, he cautioned that a traumatic disc injury begins an arthritic process whereby the disc degenerates earlier and more severely than it would under normal circumstances. Consequently, Dr. Blanda believed that Mr. Fruge was more likely to need surgery in the future than the average person who did not have a disc problem at such an early age. Dr. Blanda strongly recommended against Mr. Fruge performing heavy work, as the more stress put on the back would increase the chance of needing a fusion in the future. Dr. Blanda believed Mr. Fruge should lift no more than 20-25 pounds, with no repetitive bending or stooping. He had no objection to Mr. Fruge performing medium work, provided he was qualified for it and a functional capacity examination (FCE) showed him capable of it. At the time of his deposition, Dr. Blanda understood that Mr. Fruge was performing light-duty work with accommodations from his employer. Should Mr. Fruge continue on that path, Dr. Blanda believed there was less of a chance of severe problems in the future.

Another orthopedic specialist, Dr. Douglas Bernard, examined Mr. Fruge on May 3, 2001, at the request of Defendants. Dr. Bernard recorded a normal examination with no neurologic findings. He did not believe that the degeneration at L5-S1 was caused by the accident, but he acknowledged that less than 10% of the population would have a degenerative disc by age 21. He agreed with Dr. Blanda that Mr. Fruge was at a greater risk for future surgery because of the herniation and that Mr. Fruge would have a reduced chance of future back problems if he switched from medium or heavy labor to a supervisory position with minimal lifting.

At the time of the accident, Mr. Fruge was a 21-year-old machinist employed by Stabil Drill Specialties, Inc. (Stabil Drill). He described that position as involving standing at all times, with frequent stooping and bending and some lifting of 40-50 pounds. He testified that, because he could not perform this work after the accident, his employer "made up" a job for him as a night supervisor in which he handled most of the paperwork from the day and night shifts. This accommodation, he explained, permitted him to sit most of the time, unlike the other night supervisors who were expected to stand all night overseeing the machinists under them. After working for one year as a night supervisor, Mr. Fruge was retrained by his employer as a computer numerical control (CNC) operator, a job he described as "more of a mental position than manual position" that did not require stooping or bending. However, because he cannot stand the entire shift without pain, he explained that his employer continues to make accommodations not available to other CNC operators, in that he is allowed to sit and take breaks as needed and someone is available to help him with the pushing and pulling requirements of the job. As a machinist, Mr. Fruge earned $28,614.00 in 1999, the year of the accident. In 2000, he earned $51,013.00 as a night supervisor, and in 2001, he earned $59,081.00 as a CNC operator.

Patrick McJimsey, production manager of manufacturing at Stabil Drill, explained that 95% of a CNC operator's job is watching the machine, which requires being in a standing position to stop the machine if anything goes wrong. Because of Mr. Fruge's employment record and ability, however, he is the only CNC operator who is allowed a chair by his work station. Mr. McJimsey also testified that Mr. Fruge is the only CNC operator who cannot perform the job of a manual machinist as well. Because of these accommodations, Mr. McJimsey explained,

3

Mr. Fruge would be the "first to go" should the oilfield experience a decline during its many "ups and downs."

Dr. John W. Grimes, a rehabilitation counselor, testified on behalf of Mr. Fruge as to his future employment prospects. Dr. Grimes' testing indicated that Mr. Fruge was in the upper limits of the low average range, functioning at an eleventh grade level in word recognition, a ninth grade level in spelling, and an eighth grade level in math. Because of Mr. Fruge's physical limitations, Dr. Grimes believed that he has suffered a "loss of access" to certain positions that is yet to translate into a loss of earnings, but that could significantly impact his income in the event of future medical problems or economic fluctuations. Dr. Grimes considered Mr. Fruge fortunate that his employer provided him with "accommodated employment" that, if maintained, would not result in a loss of earnings. However, Dr. Grimes was concerned that, should Mr. Fruge lose this "niche" in his field, he would either be thrown back into a manual labor position that he could not perform or he would be at a disadvantage in competing for supervisory jobs because of his youth. Dr. Grimes considered Mr. Fruge particularly disadvantaged in the first scenario, should he apply for a manual job either being at risk for further injury or requiring extensive assistance to perform the work.

Nancy Favaloro, a rehabilitation counselor testifying for the defense, believed that Mr. Fruge could not only perform his present job of a CNC operator without any accommodations, but that he could return to manual machinist work as well. She based this opinion on her own testing, which showed him to have an above average aptitude in general intelligence, and on an FCE that indicated he could tolerate medium to "medium heavy" work. She felt that Mr. Fruge's earning capacity had

4

increased since the accident because he acquired a new skill as a CNC operator that is transferable to industries other than the oilfield.

James Sellers, who conducted the FCE on October 10, 2002, testified that its results indicated that Mr. Fruge would meet the job descriptions of a CNC operator and a machinist. However, he acknowledged that frequent or continuous lifting could cause further damage of the disc and that Mr. Fruge should modify his activities based upon his actual complaints. At the time of the FCE, Mr. Fruge still exhibited restrictions in trunk and lumbar range of motion, with some hamstring tightness bilaterally. David Hite also provided physical therapy services to Mr. Fruge at the same clinic. He testified that Mr. Fruge had a positive response to therapy, although he showed a limited tolerance for sustained forward bending. He considered the FCE as a measure of what a person could do in two days at the clinic, from which certain extrapolations were made. However, he testified that he would advise anyone with a disc-related problem to avoid sustained, forward bending because of the stress it creates on the discs of the low back, regardless of whether that position was performed without complaints during testing.

Dr. Douglas Womack, an economist, agreed that Mr. Fruge would not suffer a loss of earnings if he were able to keep his current job, which he understood to be "sheltered employment." His calculations addressed Mr. Fruge's residual earning capacity should he lose his present position and be forced to compete in the labor market with restrictions as outlined by Dr. Grimes. Dr. Kenneth Boudreaux, who testified for the defense, did not believe Mr. Fruge sustained any loss of earning capacity, considering that he has acquired a new, transferable skill. Recognizing the volatility of the oilfield, Dr. Boudreaux acknowledged that a significant decline in rig

5

activity could result in industry-wide layoffs of 25-30%. However, Dr. Boudreaux also pointed out that Mr. Fruge was able to maintain his present employment through a downturn in oilfield activities in mid-2001, as shown by a declining rig count for that time.

In finding that Mr. Fruge sustained a loss of earning capacity, the trial court explained:

> Because he has an uncontroverted herniated lumbar disc, with a ten (10%) percent impairment, with a restriction of performing on medium work, and with only a high school education, he has definitely sustained a loss of earning capacity. Though, by the grace of Stabil Drilling company it has not yet manifested itself yet, plaintiff would be relegated to seeking employment with a high school education and a bad back. . . . Before the accident, plaintiff was able to do heavy duty work and the job of a machinist. And, considering his proven motivation and skill, plaintiff could have easily moved up the economic ladder. Now, he is stymied and at the mercy of Stabil Drilling and the oilfield . . . . But for his good fortune with Stabil, plaintiff, after this accident, would have been in a bind.

## Loss of Earning Capacity

In arguing that the award for loss of earning capacity was in error, Defendants challenge some of the trial court's factual conclusions. They contend that the record does not support the findings that Mr. Fruge has a residual disability and that his employer is making special accommodations for him. They also contend that the award was unwarranted given his increase in income and acquisition of new skills.

"A trial court's award for loss of earning capacity is reviewed under the manifest error standard of review." *Bellard v. S. Cent. Bell Tel. Co.*, 96-1426, p. 17 (La.App. 3 Cir. 8/27/97), 702 So.2d 695, 705, *writ denied*, 97-2415 (La. 12/12/97), 704 So.2d 1202. To recover for loss of earning capacity, the plaintiff must produce medical evidence indicating with reasonable certainty that he has a residual disability

6

causally related to the accident. *Kennedy v. Columbus Am. Props., L.L.C. ex rel Joseph Canizaro Interests*, 99-940 (La.App. 4 Cir. 1/12/00), 751 So.2d 369.

Defendants point to the opinion of Ms. Favaloro and the results of the FCE in arguing that Mr. Fruge has no residual disability because they indicate that he can still perform the job of a machinist. However, the trial court's conclusion to the contrary is supported by the testimony of Dr. Blanda, Mr. Hite, and Mr. Sellers. Dr. Blanda assigned Mr. Fruge a 10% permanent disability with instructions that he is not to place too much stress on the damaged disc to prevent further injury. Mr. Fruge's best course of conduct, according to Dr. Blanda, was to continue in his current light-duty employment. Mr. Hite strongly advised against sustained forward bending for anyone with a disc problem, regardless of the FCE results, and Mr. Sellers advised Mr. Fruge to modify his activities based upon his actual complaints. When this testimony is considered with Mr. McJimsey's description of a manual machinist's work as a "rough" twelve hours involving "a lot of stooping, lifting back and forth" and being "slumped over most of the day," we find no error in the trial court's conclusion that Mr. Fruge can no longer perform that job. Defendants also question whether Stabil Drilling is presently providing special accommodations to Mr. Fruge, arguing that it would be illogical for the employer to place its expensive machinery at risk. However, the trial court heard and accepted as credible Mr. McJimsey's testimony that Mr. Fruge is treated differently from other CNC operators. We find no error in this regard.

In *Batiste v. New Hampshire Ins. Co.*, 94-1467, p. 3 (La.App. 3 Cir. 5/3/95), 657 So.2d 168, 170, *writ denied*, 95-1413 (La. 9/22/95), 660 So.2d 472 (citation

7

omitted) (emphasis added), this court explained the relationship between income and earning capacity as follows:

> Loss of earning capacity is not the same as lost wages. Rather, earning capacity refers to a person's potential. *Earning capacity is not necessarily determined by actual loss*. While the plaintiff's earnings at the time of the accident may be relevant, such figures are not necessarily indicative of his past or future lost earning capacity. The plaintiff need not be working or even in a certain profession to recover this type of award. What is being compensated is the plaintiff's lost ability to earn a certain amount, and he may recover such damages even though he may never have seen fit to take advantage of that capacity.
>
> In determining whether a personal injury plaintiff is entitled to recover for the loss of earning capacity, the trial court should consider *whether and how much plaintiff's current condition disadvantages him in the work force*. The trial court should thus ask itself what plaintiff might be able to have earned but for his injuries and what he may now earn given his resulting condition.

"[W]hat the plaintiff earned before and after the injury does not constitute the measure" of damages for loss of earning capacity. *Hobgood v. Aucoin*, 574 So.2d 344, 346 (La.1990) (citing *Folse v. Fakouri*, 371 So.2d 1120 (La.1979)). In *Hobgood*, a plaintiff with a 10% permanent whole-body disability due to a back injury was awarded $50,000.00 for loss of earning capacity, even though his income had risen since his accident. Notwithstanding the increase in his business income, the self-employed plaintiff was able to prove "that his ability to earn a living [was] impaired by his back injury." *Id.* at 347.

In *Sallis v. City of Bossier City*, 28,483 (La.App. 2 Cir. 9/25/96), 680 So.2d 1333, *writ denied*, 96-2599 (La. 12/13/96), 692 So.2d 1063, and *writ denied*, 96-2592 (La. 12/13/96), 692 So.2d 376, the plaintiff, who sustained a severe knee injury, was able to return to his former job only because his employer "permanently accommodated his disability." *Id.* at 1341. (A member of a telephone-line repair crew, the plaintiff could return to his unit, but only because he was allowed to work

8

on the ground while the other crewmen did all the climbing.) His need for this accommodation, however, took away any opportunity for transfer or promotion, which in turn, greatly increased his chance of being laid off in his employer's five-year work-reduction plan. Even though the 30-year-old plaintiff returned to his former job and was making more money, the second circuit recognized that he did sustain a loss of earning capacity based upon his residual disability, his loss of advancement opportunities, and the likelihood that his job was in jeopardy. Accordingly, the court affirmed an award of $200,000.00 for these injuries.

In the present case, the trial court found that Mr. Fruge sustained an obvious injury that prevented him from performing his former job and that permitted his current employment only through the "grace" of a benevolent employer. The trial court further found that Mr. Fruge was "at the mercy" of this employer, as well as the volatile oilfield industry. We agree with the trial court that Mr. Fruge has sustained a loss of earning capacity. Although he has yet to suffer a monetary loss, his injury places him at a great disadvantage in the labor market. He can no longer perform the work for which he was originally trained, and he can perform his new skill only with accommodations from his present employer. He has demonstrated that he will have great difficulty in competing for jobs, which in turn, would significantly impact his future income, should his precarious position be altered. We find that Mr. Fruge is entitled to compensation for this disadvantaged economic position.

In measuring such a loss, we stated in *Batiste*, 657 So.2d at 170 (emphasis added):

> *The very nature of lost earning capacity makes it impossible to measure the loss with any kind of mathematical certainty*. The facts of each case must take into account a variety of factors, including the plaintiff's condition prior to the accident, his work record prior to and

9

after the accident, his previous earnings, the likelihood of his ability to earn a certain amount but for the accident, the amount of work life remaining, inflation, and *the plaintiff's employment opportunities before and after the accident.*

Mr. Fruge was a 21-year-old manual laborer with only a high-school education at the time of the accident. Since the accident, he has acquired a new skill, but he is unable to comply with the postural requirements of that job without modification by his present employer. Although Defendants presented evidence that his new skill is transferable to other industries, they have not shown whether those opportunities are available in this geographic region. Dr. Womack estimated Mr. Fruge's future work-life expectancy from the date of trial to be 33.84 years. The trial court's award of $90,000.00 amounts to less than four years of his previous salary and is less than any calculation submitted by Dr. Womack. We find no abuse of discretion in the award.

**Decree**

For the above reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed to Defendants-Appellants.

**AFFIRMED.**