STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

CA 08-1369


JACKIE RAY BENNET

VERSUS

CITY OF NEW IBERIA

**********

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, NO. 106114-C
HONORABLE JOHN E. CONERY, DISTRICT JUDGE

**********

SHANNON J. GREMILLION
JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, J. David Painter, and
Shannon J. Gremillion, Judges.

**AFFIRMED.**

David W. Groner
Attorney at Law
230 Main St.
New Iberia, La 70560
(337) 364-3629
Counsel for Plaintiff /Appellant:
Jackie Ray Bennet

Rene Sylvain Paysse, Jr.
Neal John Favret
Thomas Paul Anzelmo, Jr.
Johnson, Johnson, Barrios, & Yacoubian
701 Poydras St., #4700
New Orleans, LA 70139-7708
(504) 528-3001
Counsel for Defendant /Appellant:
City of New Iberia

**Marcus A. Bryant**
**Attorney at Law**
**1408 W. Pinhook Rd., Ste. A**
**Lafayette, LA 70508**
**(337) 504-4106**
**Counsel for Plaintiff/Appellant:**
**Jackie Ray Bennet**

**GREMILLION, Judge**.

The defendant, the City of New Iberia, appeals the judgment in favor of the plaintiffs, Jackie Ray Bennet, individually and as natural tutor over the estate of his minor child, Joshua Bennet, awarding Joshua $197,601.48, plus court costs and judicial interest from the date of judicial demand. For the following reasons, we affirm.

## PROCEDURAL AND FACTUAL BACKGROUND

In late July 2005, Joshua, who was ten years old at the time, attended the "Softball Fun Day" at City Park in New Iberia, Louisiana. The property is owned and administered by the City. Included at the festivities was a child's motorized train driven by an employee of the City's recreation department. Joshua's foot was seriously injured after the driver of the train hit a bump, causing Joshua's foot to get entangled in the wheel, which thereafter rolled over his foot. Jackie filed suit against the City. Following a two-day bench trial in February 2006, the trial court awarded Joshua $197,601.48 (comprising past medical expenses in the amount of $19,531.48, future medical expenses in the amount of $70,570, $7,500 for permanent scarring, and $100,000 for past and future physical and mental pain and suffering and loss of enjoyment of life), plus court costs and judicial interest from the date of judicial demand. The trial court declined to award an amount for loss of future earning capacity. Both the City and Jackie now appeal.

## ISSUES

The City assigns as error:

1. The trial court's finding that it was 100% at fault for Joshua's injuries when his mother, Paula Bennet, testified that she left her ten-year-old son unsupervised at the park.

1

2. The trial court's finding that the City was 100% at fault despite expert testimony that the manufacturer of the train failed to install seat belts or construct fenders or running boards to protect occupants from moving parts, including the tires.

3. The trial court's award of $100,000 in general damages for a broken toe.

Jackie assigns as error:

1. The trial court's failure to find a loss of earning capacity for Joshua when he suffered a 12% permanent disability of his lower extremity and would likely have followed in father's footsteps and sought employment offshore.

**LIABILITY**

The City argues that it was error for the trial court not to apportion fault to Paula or to Stephen Thebedeaux, the maker of the train.

In *Layssard v. State, Dep't of Public Safety and Corrections*, 07-78, p. 3 (La.App. 3 Cir. 8/8/07), 963 So.2d 1053, 1057, *writ denied*, 07-1821 (La. 11/9/07), 967 So.2d 511, the standard of review for a trier of fact's apportionment of fault was set forth as follows:

> The Louisiana Supreme Court, in *Duncan v. Kansas City Southern Railway Co.,* 00-66, pp. 10-11 (La. 10/30/00), 773 So.2d 670, 680-81, set forth the standard for reviewing comparative fault determinations as follows:
>
> > This Court has previously addressed the allocation of fault and the standard of review to be applied by appellate courts reviewing such determinations. Finding the same considerations applicable to the fault allocation process as are applied in quantum assessments, we concluded "the trier of fact is owed some deference in allocating fault" since the finding of percentages of fault is also a factual determination. *Clement v. Frey*, 95-1119 (La.1/16/96), 666 So.2d 607, 609, 610. As with other factual determinations, the trier of fact is vested with much discretion in its allocation of fault.

2

Therefore, a trier of fact's allocation of fault is subject to the manifestly erroneous or clearly wrong standard of review. A trial judge's findings of fact will not be disturbed unless they are manifestly erroneous or cleary wrong. *Stobart v. State, through Dep't of Transp. & Dev.,* 617 So.2d 880 (La.1993). "Absent 'manifest error' or unless it is 'clearly wrong,' the jury or trial court's finding of fact may not be disturbed on appeal." *Sistler v. Liberty Mut. Ins. Co.,* 558 So.2d 1106, 1111 (La.1990). "If the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Id.* at 1112.

The testimony at trial regarding how the train came into use at the Fun Day was as follows: Hayward Migues, Jr. testified that he is the Superintendent of Parks and Recreation and that he organized the Fun Day event. He became aware of the train because he saw it traveling around the park. He said that Thebedeaux asked if he could ride his grandchildren in the train in the park. Migues stated that he thought it would be a good idea to have the train for Fun Day. According to Migues, Thebedeaux did not charge the City for using the train and City employees went to Thebedeaux's house to pick up the train. Migues stated that another city employee, Howard Rogers, drove the train on Fun Day. Migues testified that he asked Rogers to inspect the train overall, but did not require that he sign any paperwork. Further, he stated that he did not ask Thebedeaux for any paperwork relating to the train. Migues and Thebedeaux did have a conversation in which they discussed the construction of the train, but Migues did not ask for specifications or building standards Thebedeaux may have used when he built the train. Migues further testified that he visually inspected the train.

Migues admitted that he was unfamiliar with La.R.S. 40:1484.4, which provides regulations for the inspection of amusement attractions and rides and states, in pertinent part:

A. Except for the purpose of testing, training, and inspection, no air-supported structure, amusement attraction or ride shall be operated in this state without an inspection having been conducted by an inspector and a certificate of inspection having been issued by the assistant secretary to an operator of such equipment.

B. (1) Every air-supported structure, amusement ride or attraction shall be inspected by an inspector for safety and subjected to nondestructive testing in accordance with ASTM-F-24 at least annually.

The statute requires certification of the results of the inspection and notification to the assistant secretary of the office of the State Fire Marshall by the operator of the amusement ride of his intent to commence operation at least thirty days prior to operation of any amusement ride or attraction. La.R.S. 40:1484.4(B)(2) and (C)(1). After reviewing La.R.S. 40:1484.4, Migues admitted that its requirements were not met. He went on to state that he was unfamiliar with La.R.S. 40:1484.2(3), but that after reviewing it he agreed that the train was an amusement ride within the definition of the statute. La.R.S. 40:1484.2(3) states:

"Amusement ride" means any mechanized device or combination of devices which carries passengers along, around, or over a fixed or restricted course for the purpose of giving its passengers amusement, pleasure, thrills, or excitement. "Amusement ride" also includes any mechanized device or combination of devices of a permanent nature even though such device or combination of devices is subject to building regulations issued by cities or parishes and existing applicable safety orders.

Migues testified that he instructed Rogers to drive the train at a speed of less than fifteen miles per hour, to have the kids dry off before getting on the train if they were coming from the pool, and to instruct the kids to keep their hands and feet inside the train. He further stated that parents were not required to ride with their children. Migues testified that he was not at the park at the time of the accident.

Rogers testified that he has been a park ranger for eleven years and that his duties included safety and security. He said that he drove the train at Fun Day.

4

Rogers testified that he did not have any discussions with Thebedeaux about the train. He said that he, Migues, and Brian Romero, the maintenance supervisor, visually inspected the train. After a trial run, Rogers said that he felt the train was "safe enough" to pull. He stated that he drove the train at less than fifteen miles per hour.

Rogers said that on the day of the accident he picked the kids up in front of the pool. He stated that he used his judgment with regard to how wet the children were after getting out of the pool. He said that as the train went through a dip in the street, he heard people shouting to stop the train. He said the next thing that he saw was Joshua running from the train. Rogers said that the train had no guards covering the wheels, no running boards next to the wheels, no foot rails, or any kind of protective covering over the tires.

Thebedeaux testified that the train was built for his personal use. He said that he came up with the idea after seeing things on TV. He said that he did not purchase anything for the design of the train, nor did he purchase any regulations. He further testified that he did not write the design of the train down nor did he receive any training for building trains. Thebedeaux testified that he and Migues did not discuss any specifications, regulations, or inspections. He said that he told Migues that he did not have insurance on the train, but that Migues said it would be covered while it was on the City's property. Thebedeaux said that prior to the accident in question the City borrowed the train eight to ten times on weekends. Thebedeaux said that, following the accident, he made some modifications to the train.

George Fred Liebkemann, IV, an expert in mechanical and safety engineering, testified that he inspected the train following the accident. Liebkemann testified that had the train been inspected, pursuant to La.R.S. 40:1484.4, it would not

5

have passed because the unguarded wheels violated safety regulations.

Joshua testified that he boarded the train and was not given any safety instruction by the driver. He said that the train hit a dip in the road causing him to bump up and his foot to slip off of the floor of the train. He said his foot got caught in between the tire and axle.

The trial court, in its well-reasoned written reasons for judgment, found that the City was negligent in:

> failing to inspect the cart and take appropriate action to make certain that the wheels were covered or protected before allowing young riders to be on the cart. The Court also finds the City was negligent in that its employee driving the car drove at an excessive rate of speed under the circumstances and didn't slow for a bump in the road, or a dip in the road, causing Joshua, who was seated on his seat at the time of the incident properly and in the right location, to bump from his seat. The Court finds it caused Joshua to bump from his seat, causing his foot to come into contact with the unguarded tire, proximately causing the injuries and damages in this litigation.

> Regardless of whether or not strict liability applies under 40:1484.3 and 40:1484.4, the Court finds that the City is responsible based on negligence. As to the strict liability argument, the Court finds that the City is also strictly liable having guard over a defective product over which it knew, or should have known, of the defect. 40:1484.3 compels certificates of inspection. Had that been done in this case, then the cart could not have been used in service at the time of this particular injury. That is not to say that the employees of the City were callous or in complete disregard of the safety of their young charges on the day of the accident. They took what they felt at the time to be reasonable precautions; but reasonable people could and should have been aware of the inspection requirements and could and should have been aware of the dangerous condition of the cart, having an unguarded tire in close proximity to young feet as they were pulled through the City Park over speed bumps and uneven surfaces. It certainly was easily foreseeable that something like this could and would happen if unbuckled children, whose feet were 2-5/16" from an unguarded wheel, were riding in a cart and that cart hit a bump or a dip causing their to come into contact with that wheel, as happened in this particular case.

Regarding fault allocation to Thebedeaux, the trial court found:

> [T]here is no comparative fault on the part of Stephen Thebedeaux.

6

> This man didn't build the train to lease it out or lend it out to the City of New Iberia. They (the City of New Iberia) took the responsibility when they got it for the condition of the train, and the City (of New Iberia) was the one that had the duty to inspect before allowing anyone to ride. The owner never represented anything to the City (of New Iberia) anything about the train, other than, "You can use if you want to." He built the train for his grandchildren and wasn't expected to build it up to specs. Though he did allow the City (of New Iberia) to use it, they assumed all of the responsibility for it when took it into their guard or possession.

We cannot say that the trial court manifestly erred in apportioning 100% fault to the city. We note that the City failed in its duty to not only have the train inspected to be sure it met safety regulations, but also to inform the assistant secretary in writing thirty days ahead of time that it intended to use the train at the Fun Day. We additionally find that the presence or absence of Paula had no bearing on the occurrence of this accident. The City specifically allowed children to ride the train without parental supervision; moreover, there is nothing to suggest that a parent's presence on the train would have eliminated the safety issues surrounding a completely unguarded tire in close proximity to passengers' feet. There is no manifest error in the trial court's finding that the train was negligently operated by the driver. Finally, we cannot say the trial court erred in not apportioning fault to Thebedeaux. It is clear that he built the train for personal use and the City approached him about using it for Fun Day, which he generously agreed to provide free of charge. Accordingly, there was no error in the trial court's finding that the City assumed the responsibility for using the train at a public event. For all of these reasons, apportioning fault 100% to the City was not erroneous and this assignment of error is without merit.

## GENERAL DAMAGES

General damages are speculative in nature and, thus, are incapable of

7

being fixed with any mathematical certainty. *Wainwright v. Fontenot*, 00-492 (La.10/17/00), 774 So.2d 70. They include pain and suffering, physical impairment and disability, and loss of enjoyment of life. *Id.* As they are speculative, a trial court's award of such damages is reviewed in light of the standard set forth in *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257 (La.1993), *cert. denied*, 510 U.S. 1114, 114 S.Ct. 1059 (1994). First, we determine if the trial court's award for the particular injury and its effect under the particular circumstances on this plaintiff is a clear abuse of the trial court's "much discretion." *Id.* at 1260. "It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award." *Id.* at 1261.

Again, the trial court provided extensive, well-thought out, reasons for awarding Joshua $100,000 in general damages as follows:

> As to the award for pain and suffering, there is no doubt that this was an extremely painful injury for young Joshua. The evidence was clear that he was screaming in pain at the time his mother picked him up and brought him to Dauterive Hospital. The city workers apparently did an exceptional job in cleaning that wound, as did Dauterive (Hospital), as did the Lafayette General Hospital because no infection took place and that wound was able to heal without infection; but not without some considerable pain on the part of Joshua.

> In addition to the pain he experienced required morphine, a very strong pain medication at the hospital, he continued to suffer excruciating pain when that wound was changed by the home health care people, so much so that his mother and father had to help hold him down, depending on who was available, as that dressing was changed, and so much so that he fought those home health care workers and did not want his dressing changed. Fortunately, they prevailed, as did his parents, and that vacu-pack that was put on him did help prevent future infection that may have resulted in the loss of his foot had those dressings not been changed.

8

So he did achieve an excellent result from the surgery that was performed at Lafayette General Hospital by Dr. Hebert, as well as the after-care from the nurses, and especially by his mother, and to some extent his father, who sat on him and made sure that his wound was cleaned and made sure that he was not allowed to play in the yard or do anything that might get that wound infected. They took a lot of love and care and attention with him to make certain that that wound healed, and they are to be commended for that. He did, however, suffer a considerable amount while those home health care workers were working with him and while that would was being dressed and re-dressed, and to some extent through October the 17th of `05 continued to suffer some fairly substantial pain.

At about that time he was released to go back to a regular school setting and to wear a regular shoe. He did wear an open-toe boot for some time after he regained his ability to walk at school, and he suffered some embarrassment because of that. And then finally, was able to wear the regular shoe.

He continued to suffer with pain at school through at least through October of `06 when things seemed to have stabilized to some extent; and though he continued to have some pain and discomfort upon excessive motion, for the most part he has had an excellent result and has made an extremely good recovery.

The testimony was that in February of `07 when he attended a Cajun Fun Fest during Mardi Gras in Lafayette, he had to stand and walk for two (2) to three (hours) at a time, resulting in some swelling and some additional pain, for which he was seen by Dr. Hebert and treated, with the caution that: If swelling occurred, or if fever occurred, or anything of the like occurred, he was to return immediately. Apparently he either modified his activities or did not suffer any additional bouts that required him to be brought to the hospital.

There was some testimony that from time to time his foot did swell on extremes of activity and his mother had to get him to sit down and get off of his feet. There was some testimony that from time to time in P.E., or in other activities, he had some pain on extremes of activity, basketball practice, etc., all of which has been considered by the Court and is being considered.

There was some additional testimony that in 2006 in September he started the After School Program and was extremely active during the program with no complaints. Indeed there were no medical records to corroborate or substantiate that he had to see the doctor, or suffered any pain or swelling as a result of those activities.

The last young lady who testified made a very credible witness,

9

and the Court accepts her testimony as credible and believable (Crystal Boyance), [that] she was in daily contact with Joshua in the `06 school year; and if not daily, significant contact in the `07 school year, and she was not even aware that he had a foot injury. Certainly he exhibited no real problems, which indicates that he was not having any significant pain or swelling in `06 or `07, except for the incident reported by his mother, and that was reported to Dr. Hebert.

That is not to say he was not having problems. It is not to say that he didn't suffer; but it wasn't to the extent that it required medical treatment and it wasn't to the extent that it was an unusual amount of suffering. Certainly the Court accepts his testimony, as well as that of his mother, that on extremes of motion and activity he did have some swelling and pain that continues to this day. But fortunately for him, it wasn't to the extent that disables him from any of his regular activities.

The testimony was clear that he is not playing basketball, not because of his inability to do so because of his injury, but because of his mother's wise decision to try to keep him from sports until he can focus on a much more important aspect of his youthful upbringing, and that is his education. . . .

Certainly he is not medically limited from performing any activity. He is limited on self-limited by pain, and the Court finds that that pain is not so significant as would impair his ability to do normal sports activities and normal activities. If it does get to that point, which the Court feels the doctors have said it eventually will, that is when the fusion will take place, the future surgery, for which he will also experience pain and suffering and some significant pain during post-op treatment and recovery. But after that, according to both doctors, he should be good to go for just about anything.

He will have a permanent impairment and a permanent disability as a result of this lower extremity injury: 12% of the lower extremity and 5% of the foot, I believe, according to the doctors; so there is some permanent disability.

Considering all of the evidence that the Court has heard and the law, the Court feels a general damage award in the amount of one Hundred Thousand ($100,000.00) Dollars would be fair, just, and reasonable for Joshua under the circumstances of this case.

Certainly Mr. Favret has cited cases to the Court that would, in his view and in the Defense's view, would warrant an award substantially less than that, a $30,000.00-range. Mr. Bryant has cited cases to the Court in the $175,000.00 to the $200,000.00-plus range, and the Court has considered those awards.

10

The bottom line in this case however, is that the young man has achieved what the doctors feel is an excellent result; and even though he has suffered considerably and will continue to suffer in the future, and will have a permanent loss of enjoyment of life to some extent based on that disability in the future, an award of One Hundred Thousand ($100,000.00) Dollars in this Court's view adequately compensates Joshua for his general pain and suffering, past and future, and loss of enjoyment of life.

Having reviewed all of the testimony and evidence, we find that the trial court did not abuse its discretion in awarding Joshua $100,000 in general damages. It was clear from reading Joshua, Paula, and Jackie's testimony that Joshua's injury was painful, required surgery and an extended period of recovery at home, the use of orthodics and a boot at school, alteration of his normal levels of activity and play, and ongoing pain, depending on activity. Accordingly, this assignment of error is without merit.

## FUTURE LOSS OF EARNING CAPACITY

Joshua argues the trial court erred in failing to award him an amount for future loss of earning capacity. We disagree. In *Batiste v. New Hampshire Ins. Co.*, 94-1467, pp. 3-4 (La.App. 3 Cir. 5/3/95), 657 So.2d 168, 170, *writ denied*, 95-1413 (La. 9/22/95), 660 So.2d 472 (citations omitted), we stated:

Loss of earning capacity is not the same as lost wages. Rather, earning capacity refers to a person's potential. Earning capacity is not necessarily determined by actual loss. While the plaintiff's earnings at the time of the accident may be relevant, such figures are not necessarily indicative of his past or future lost earning capacity. The plaintiff need not be working or even in a certain profession to recover this type of award. What is being compensated is the plaintiff's lost ability to earn a certain amount, and he may recover such damages even though he may never have seen fit to take advantage of that capacity.

In determining whether a personal injury plaintiff is entitled to recover for the loss of earning capacity, the trial court should consider whether and how much plaintiff's current condition disadvantages him in the work force. The trial court should thus ask itself what plaintiff might be able to have earned but for his injuries and what he may now

11

earn given his resulting condition.

The very nature of lost earning capacity makes it impossible to measure the loss with any kind of mathematical certainty. The facts of each case must take into account a variety of factors, including the plaintiff's condition prior to the accident, his work record prior to and after the accident, his previous earnings, the likelihood of his ability to earn a certain amount but for the accident, the amount of work life remaining, inflation, and the plaintiff's employment opportunities before and after the accident.

An award of damages for future loss of earnings and loss of earning capacity is reviewed on appeal for manifest error. *Fruge v. Hebert Oilfield Constr., Inc.*, 03-349 (La.App. 3 Cir. 10/1/03), 856 So.2d 100, *writ denied*, 03-2997 (La. 1/30/04), 865 So.2d 77.

Glenn Hebert, a licensed rehabilitation counselor, testified that he works with individuals that are disabled, conducting vocational assessments, loss of earning capacity assessments, and helping them go back to work if feasible. He was qualified as an expert in vocational rehabilitation. Hebert discussed all of the factors that go into making an assessment, particularly in a child who has no work background, such as his educational achievements and his parents' occupations. Hebert determined that it was unlikely that Joshua would attend college since his parents do not have college degrees. He determined that it was most likely that Joshua would be a general laborer either offshore or on land. He further opined that with a 12% impairment in his foot he would be unable to engage in jobs that require a lot of climbing up and down stairs, squatting, picking up heavy weights and walking with them. These restrictions were also based on testimony that Joshua would develop arthritis and probably have to have toe fusion surgery in the future.

Hebert testified that he looked at the average weekly wage paid to laborers. Finding that "children normally follow in their father's footsteps," Hebert

12

said that as a laborer in the Gulf of Mexico he would make $8.00 to $8.50 per hour. Hebert then essentially stated than any anatomical loss would incur a loss of future earning capacity. This subject was debated and Hebert admitted that he was not sure if a loss would be incurred if the patient is not restricted from performing any activity that is required of the job. However, he opined that any potential loss of earning capacity is a loss even if one does not actually lose money. Hebert admitted that Joshua's physician did not say that Joshua would have a problem working in the future.

R. Douglas Womack, an expert in economics, testified that he looked at Joshua's earning potential before and after the accident. According to Hebert's calculations that Joshua could have earned $9.00 per hour, but due to his disability he would probably earn $6.50 an hour, he would lose $139,838 over his work-life expectancy, and $186,298 if he worked until age 67. If he were to follow in the his father's footsteps, Womack stated that he would lose $667,133 or $888,783 if he worked until he was 67. Womack discussed in detail various factors that were used in making those determinations.

Again, after providing extensive written reasons for judgment the trial court found:

> After an extensive review of the jurisprudence and full consideration of all of the evidence, briefs, and argument of counsel, in this case, this Court is not persuaded that more likely than not, Joshua has proved a loss of earning capacity. Dr. Hebert's testimony is clear that a fusion will actually help Joshua in the future, and though he will have a permanent physical impairment and anatomical disability rating, for which he has been generously compensated, the Court finds that an award for loss of earning capacity in this case is too speculative and has not been proven by a preponderance of the evidence.

The trial court found that Hebert's testimony was not supported by

medical evidence or from studies. It further found that it was speculative whether Joshua's disability would cause any functional loss of ability to do anything. We find no manifest error in these findings. This assignment of error is without merit.

## CONCLUSION

The judgment in favor of the plaintiffs, Jackie Ray Bennet, individually and as natural tutor over the estate of his minor child, Joshua Bennet, awarding them $197,601.48, plus court costs and judicial interest from the date of judicial demand, and against the defendant, the City of New Iberia, is affirmed. All costs of this appeal are assessed against the City of New Iberia.

**AFFIRMED**.