# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 09-1270


**VIRGINIA PEOPLES, ET UX.**

**VERSUS**

**FRED'S STORES OF TENNESSEE, INC.**


************

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 221,709
HONORABLE MARY L. DOGGETT, DISTRICT JUDGE

************

## DAVID E. CHATELAIN*
## JUDGE

************

Court composed of Sylvia R. Cooks, James T. Genovese, and David E. Chatelain, Judges.


**AFFIRMED.**


**Stephen C. Resor**
**Michael M. Meunier**
**Amy D. Hotard**
**Sullivan, Stolier, & Resor**
**909 Poydras Street, Suite 2600**
**New Orleans, Louisiana 70112**
**(504) 561-1044**
**Counsel for Defendant/Appellant:**
      **Fred's Stores of Tennessee, Inc.**

---

*Honorable David E. Chatelain participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.

**Roy S. Halcomb, Jr.**
**Broussard, Halcomb & Vizzier**
**Post Office Box 1311**
**Alexandria, Louisiana  71309-1311**
**(318) 487-4589**
**Counsel for Plaintiffs/Appellees:**
    **Virginia Peoples**
    **Wyndell Peoples**

**CHATELAIN, Judge.**

The defendant, Fred's Stores of Tennessee, Inc. (Fred's), appeals from a judgment, as amended following the resolution of post-trial motions, rendered in favor of the plaintiffs, spouses Virginia and Wyndell Peoples, finding it liable for the damages they suffered following Mrs. Peoples' trip and fall at a Fred's discount store. The plaintiffs answer the appeal. For the following reasons, we affirm the judgment.

## FACTS AND PROCEDURAL HISTORY

On August 10, 2004, shortly after entering the Fred's store in Tioga, Louisiana, Mrs. Peoples, then forty-nine years of age, tripped over several boxes containing gazebos lying on the floor just to the right of the entranceway. She fell forward into a display of ice chests stacked nearby, hitting her chin before landing on her right hand and arm.

On August 3, 2005, the plaintiffs filed a petition for damages against Fred's and R. G. Williams, the manager who was on duty at the time of the accident. On January 27, 2009, the matter proceeded to a bench trial. The trial court issued extensive reasons for judgment on April 1, 2009, finding that the plaintiffs met their burden of proving negligence on the part of Fred's, thus making Fred's "liable for all damages resulting from Mrs. Peoples' fall." The plaintiffs' claims against Mr. Williams, personally, were dismissed with prejudice. After noting that the nature and extent of Mrs. Peoples' injuries were highly disputed at trial, the trial court awarded her damages in the amount of $195,554.54. That figure was itemized as follows:

| | |
|---|---|
| General damages for shoulder injury | $ 55,000.00 |
| General damages for cervical injury | $ 85,000.00 |
| General damages for wrist injury | $ 25,000.00 |

1

| | |
|---|---|
| Past medical expenses | $ 10,554.54[1] |
| Future medical expenses | $ 20,000.00 |
| TOTAL | $195,554.54 |

Mr. Peoples was awarded $7,500.00 for loss of consortium. The plaintiffs were awarded a total of $7,537.16 in fees for expert witnesses, court reporters, and certified medical records. In addition, Fred's was ordered to pay all court costs, together with legal interest on all amounts awarded. Judgment was signed on May 12, 2009.

On May 19, 2009, Fred's filed a motion for judgment notwithstanding the verdict or, in the alternative, new trial, or, in the further alternative, remittitur. On May 21, 2009, the plaintiffs filed a motion for new trial for re-argument only. The post-trial motions were heard on June 29, 2009, following which the trial court ruled in open court that it was denying the motions filed by Fred's and granting in part and denying in part the motion filed by the plaintiffs. As a result, the judgment was amended to increase the amount awarded to Mrs. Peoples for past medical expenses and to give Fred's a credit against those past medical expenses, the net result being an increase in her total damages to the amount of $199,887.75.

Thereafter, Fred's took a suspensive appeal from the amended final judgment. It is now before this court contending that the trial court erred in the following respects: (1) in permitting Michael Frenzel to testify as an expert at trial; (2) in finding that it had actual or constructive notice of the condition that caused Mrs. Peoples to fall; (3) in finding that it failed to exercise reasonable care; (4) in granting the plaintiffs' motion in limine and excluding the testimony and report of

---

[1]The judgment had a handwritten alteration that was initialed by the trial judge changing the amount awarded for past medical expenses from $10,554.54 to $11,490.56, although the total amount of the judgment was not recalculated to reflect the change.

Dr. Al Mansour; (5) in finding that the plaintiffs' injuries were proximately caused by its conduct; and (6) in issuing excessive damage awards.

The plaintiffs filed an answer to Fred's appeal, asserting that the trial court erred in granting Fred's a credit against Mrs. Peoples' past medical expenses because Fred's had not pled such a credit nor did it prove its entitlement to such a credit at trial. In the alternative, the plaintiffs asserted that even if Fred's is entitled to a credit, the trial court erred in failing to require Fred's to pay legal interest on the amount of the credit and in failing to impute the payment first to interest. The plaintiffs further alleged that the trial court erred in failing to include in its award for future medical expenses the costs for surgery to her neck and left wrist. Finally, the plaintiffs sought an increase in each of their general damages awards.

## TESTIMONY AND EVIDENCE PRODUCED AT TRIAL

Six live witnesses testified at trial. In their case-in-chief, the plaintiffs each testified, as did Mrs. Julie Paul, a shopper who entered Fred's just after Mrs. Peoples fell, and Mr. Williams, who was called on cross-examination. The plaintiffs called Mr. Michael Frenzel as an expert witness. After the plaintiffs rested, Fred's offered the testimony of Mr. Carl D'Albor, its District Manager. Medical evidence was presented in the form of doctors' depositions, medical records, and invoices.

*Factual Evidence*

Mrs. Paul stated that she and her daughter were approaching the entrance to Fred's just as the door was closing behind the Peoples. Immediately after she entered the store, she saw Mrs. Peoples on the floor about two to three feet past the end of the door. Mrs. Paul noticed several boxes, each about six feet in length, extending about one foot into the walkway. When asked by the plaintiffs' counsel whether the boxes,

as they were located that day, would have been apparent to someone entering the store, Mrs. Paul stated that she would not have noticed the boxes because her attention was drawn elsewhere. Before leaving the store, the manager asked for her name, address, and telephone number so that he could include it in the accident report. She told him that she had not actually seen Mrs. Peoples fall but, nonetheless, gave him the requested information.

Mrs. Peoples testified that she entered Fred's around 3:30 p.m. through double doors that opened into the store. The two boxes that caused her to trip were located about a foot past the end of the opened right door and were stacked longways, side by side. The ends of the boxes were lined up, and they extended approximately one foot into the walkway. She described the boxes as being six to eight feet long and six to eight inches around. The boxes were white, and they were on a white floor. Mrs. Peoples explained that after tripping over the boxes, she caught herself with her right hand, her right knee hit the concrete floor, and her chest hit an ice chest. Her husband helped her up, and they went to the service desk to tell a female employee that she had tripped over some boxes. The manager, Mr. Williams, was called; he joined them at the front of the store and filled out an accident report. According to Mrs. Peoples, when Mr. Williams saw the location of the boxes, "[h]e told a young man that worked there to move the boxes [and] that he knew better th[a]n to put them there." Later, Mr. Williams told her to go to the doctor of her choice and that Fred's would take care of the bill.

Mrs. Peoples was shown two photographs taken by Mr. Williams after the accident, which had earlier been identified as Plaintiffs' Exhibit 3, and asked to put an "X" where the boxes would have been. Mrs. Peoples complied; she explained,

4

however, that the photographs did not accurately reflect the scene as it existed when she fell. The boxes that she tripped over were not included in the photographs. Instead, the photographs showed a box of tiki torches next to the door that was not there when she fell. The stack of ice chests was nearer to the front of the store than depicted in the photographs, and there were no tables or chairs in the vicinity of the display.

After leaving Fred's, Mrs. Peoples went to the Emergency Room of LaSalle General Hospital (the ER), complaining of a headache and pain in her neck, right wrist, right arm, right shoulder, and right knee. She returned to the ER several days later with complaints of right arm and shoulder pain and tingling in her right hand. The examining physician told her that her symptoms were caused by a pinched nerve in her neck. Thereafter, she sought treatment as a charity patient at Huey P. Long Medical Center in Pineville, Louisiana.[2] At her first visit, she was diagnosed with radicular neck pain. In June of 2005, Mrs. Peoples was referred to the charity facility in Shreveport for an orthopaedic consultation. Over the course of her treatment, she underwent x-rays, several MRIs of her neck and right shoulder, and a nerve conduction test. She was told that she had carpal tunnel syndrome in both hands, and she was prescribed wrist splints to wear when she slept.

Mrs. Peoples did physical therapy and received several steroid injections in her right shoulder, but her pain persisted. In January of 2007, Dr. Michael Brunet, an orthopaedic surgeon, performed surgery on her right shoulder and did a carpal tunnel release on her right wrist. Following the surgery, she developed a bad rash and a frozen shoulder that eventually "freed up" after additional physical therapy.

---

[2]Mrs. Peoples explained that her husband was disabled and that she had not been employed since she was a teenager.

Mrs. Peoples stated that she began treating with Dr. John Cobb, an orthopaedic surgeon from Lafayette, Louisiana, after Dr. Brunet suggested that she see a private doctor because of problems with the Shreveport facility not scheduling orthopaedic appointments for her. Dr. Cobb ordered more x-rays and MRIs. After steroid injections to her neck failed to offer her much relief from her pain and headaches, Dr. Cobb recommended that she have surgery to insert metal plates in her neck to relieve the pressure. According to Mrs. Peoples, she is willing to have the surgery if it will make her pain go away. Pending surgery, Dr. Cobb gave her a Transcutaneous Electrical Nerve Stimulation (TENS) unit which she uses twice a day to help manage her pain. Dr. Cobb also recommended that she have surgery on her left wrist. Mrs. Peoples testified that she will have that surgery, too, in part because of the success achieved by the prior surgery to her right wrist. Neither surgery had been scheduled as of the trial date.

Mrs. Peoples testified that she never had any problems with her neck, shoulders, arms, wrists, or hands before being injured at Fred's in August of 2004 and that she has had pain in those areas since the accident. She described her current neck pain as "constant like needles sticking and pain shooting through . . . my shoulders and my arms and my hands." She has headaches that sometimes last two to three days at a time. Although her right wrist got much better after the surgery, her left wrist continues to be symptomatic, with the pain often preventing her from sleeping at night.

Mrs. Peoples testified that her husband has had to take over most of the housekeeping and cooking since her accident. She added that her injuries have prevented her and her husband from shopping and traveling as much as they used to

6

and that she can no longer physically interact with her grandchildren like she did prior to the accident.

R. G. Williams was called on cross-examination as part of the plaintiffs' case-in-chief. He testified that he began employment with Fred's in 1993 and that he had been the manager of the Tioga store since it opened in 1998. He was on duty at the time of the accident but did not witness Mrs. Peoples' fall. He filled out an accident report after speaking with the plaintiffs. Therein, Mr. Williams described the accident as follows: "tripped over boxes coming in the in door. Large gazebo boxes on floor in clearance area. Sold down only [two] left." He noted that Mrs. Peoples had hit her knee and hand on the floor and that her chest had hit an ice chest. He further noted that Mrs. Peoples' chin was red and that she had elbow discomfort.

Mr. Williams acknowledged having agreed in his prior deposition[3] that the boxes causing Mrs. Peoples to trip and fall were stacked on the floor by employees of Fred's where the injury occurred. He also admitted having stated in his prior deposition that the boxes may have been in the same position as when Mrs. Peoples fell for as long as three months. Mr. Williams agreed that the only routine procedure that Fred's had for inspecting and cleaning its floor was once a day by an employee at night and once every two weeks by a service company.

After testifying that the boxes which caused Mrs. Peoples to fall were four to six feet in length and weighed about thirty-five pounds, Mr. Williams admitted that he had previously stated in his deposition that the boxes were about eight or ten feet long, weighed about eighty pounds, and that it took two people to lift each box.

---

[3]Mr. Williams was deposed on April 27, 2007. Although the entire deposition was not introduced as a trial exhibit by either party, the plaintiffs did introduce a single page of the deposition as an exhibit.

7

Mr. Williams explained that the boxes were part of a clearance display at the front of the store that originally contained about a dozen gazebo boxes. He noted that they had sold quite a few gazebos on the day of the accident. He had no knowledge of anyone moving the boxes after they had been placed on the floor by Fred's employees.

On cross-examination, Mr. Williams denied having instructed any of his employees to place the boxes as close to the front door as they were when Mrs. Peoples fell. He testified that if he had seen boxes blocking the entranceway as Mrs. Peoples had described, he would have told a stock boy to move them. He admitted, however, that he instructed a stock boy to move two boxes from the front of the store after Mrs. Peoples fell so that other customers would not fall over them.

Mr. Peoples testified that his wife fell and hit the floor just as they were entering Fred's. He explained that because it happened so fast, he was not able to catch her. After checking to see if she was okay, he noticed the two gazebo boxes, laying side by side, with just the ends sticking out, two to three feet past the end of the opened door. The boxes were six or eight feet long, six or eight inches square, and heavy enough that they did not move when his wife tripped over them. He helped his wife up, and they went to get the manager. According to Mr. Peoples, Mr. Williams sat on the end of the boxes to fill out an accident report. When shown the photographs marked as Plaintiff's Exhibit 3, he confirmed his wife's testimony that these pictures taken by Mr. Williams did not accurately reflect the scene as it existed at the time of her accident. He also confirmed that Mr. Williams told another male employee to move the boxes and that "he knew not to put [th]em there to start

8

with in the walkway." He, too, related that Mr. Williams told his wife to go to the doctor of her choice and that Fred's would pay the bill.

Mr. Peoples' testimony with regard to the pain suffered by his wife and the medical treatment that she had received since the accident essentially mirrored that of his wife. He stated that because of the pain his wife was still experiencing, she intended to have surgery, and he supported that decision.

Mr. Frenzel testified that he was a board-certified safety professional who had practiced in the field of safety for approximately thirty-five years. He explained that his company provides safety program management services, including writing safety programs, doing safety inspections and audits, and providing safety training to businesses. He taught several seminars and published several articles on the subject of trip and fall prevention, and he had investigated hundreds of trip and fall accidents. Over defense counsel's objection, the trial court accepted the plaintiffs' tender of Mr. Frenzel as a safety professional with experience in hazard recognition and accident investigation.

Mr. Frenzel stated that before trial, he reviewed a copy of the petition, Fred's answer, and Fred's original and supplemental and amending answers to interrogatories and requests for production of documents, as well as the depositions of Mr. and Mrs. Peoples and Mr. Williams. He watched a safety video and reviewed a Standard Operating Procedures Manual (SOP Manual)[4] created by Fred's.

Mr. Frenzel stated that, before he testified, he had looked at all of the trial exhibits, including the accident report, photographs taken by Mr. Williams after the

_____

[4]Fred's SOP Manual was attached to Defendants' Second Supplemental and Amended Answers to Interrogatories and Request for Production of Documents, which was identified as Plaintiffs' Exhibit 9.

accident when the area had been cleared and organized, and a diagram of the front of the store drawn by Mr. Williams during his deposition. Mr. Frenzel testified that although most of the Fred's stores across the nation have very similar layouts, he visited the Fred's in Tioga on his way to trial to get "a visual" of where the accident had taken place. While there, he took measurements to enable him to better understand the dimensions of the area shown in the photographs and in the diagram. Based on all of the testimony he heard and evidence he reviewed,[5] Mr. Frenzel opined that the two gazebo boxes that caused Mrs. Peoples to fall amounted to a trip hazard that presented an "unacceptable level of risk" to Fred's customers. He explained that, regardless of their exact location, two boxes laying flat on the floor would pose an unacceptable level of risk to customers entering the store with their attention drawn to the sale merchandise, especially given the fact that the boxes in question were white and had a low profile on a white background.

Mr. Frenzel testified that the universal, industry-wide standard minimum height recommended for floor displays to prevent tripping hazards was three feet or thirty-six inches, and that Fred's Safety Inspection Form, which had earlier been identified as Plaintiffs' Exhibit 8, provided that, in the sales areas, aisle displays were to be stable and at least three feet high with no loose stock on the floor. Mr. Frenzel also identified a section of Fred's SOP Manual, entitled "Trip Hazards," which provided:

> Make sure that aisles are kept clear of any obstacle that might cause a customer to trip and fall. Merchandise should be properly placed on a shelf, an apparel rack, table or stack-out in a manner which will not present a trip hazard. If a stack-out becomes empty it should be re-stocked or removed.

---

[5]The plaintiffs, Mr. Williams, and Mrs. Paul had all testified by the time Mr. Frenzel was called as an expert witness.

Mr. Frenzel stated that, in his opinion, Fred's had violated its own policy by letting the gazebo box display sell down to such a low height and not restocking or removing it. He next identified another section of Fred's SOP Manual, entitled "Preventing Trip & Fall Accidents," which provided, in pertinent part, that "[t]he store manager will assign an employee to inspect, hourly, the aisles, entrance and exit ways . . . looking for conditions that could cause a slip or fall injury" and that "[h]azards found should be corrected immediately." Mr. Frenzel stated that, given the testimony by Mr. Williams regarding Fred's routine inspection procedures, Fred's had violated its own policy.[6] Mr. Frenzel explained that displays are always changing, depending on sales, and that a display that was once safe could be unsafe several minutes later. Finally, although he stated that he did not like to assign fault, Mr. Frenzel opined that Mrs. Peoples did nothing wrong, and, thus, she bore no responsibility for the accident and that only Fred's could have taken corrective action in this situation.

Mr. D'Albor, Fred's District Manager, was the only witness to testify on behalf of Fred's. Upon questioning from counsel for Fred's, he agreed that if someone put gazebo boxes near the front door, that would be improper because it would create a tripping hazard. He identified a gazebo box, which was marked as Defendants' Exhibit 27, which, as he recalled, was the only type of gazebo that Fred's carried in 2004 when this accident occurred. He estimated that the box weighed approximately eight pounds. On cross-examination, however, Mr. D'Albor admitted that Mr. Williams testified that the gazebo boxes that were on the floor when Mrs. Peoples tripped were much larger and heavier than the box identified at trial.

---

[6]Counsel for Fred's objected to this line of questioning, insisting that Mr. Williams was referring to those times when the floors were cleaned, as opposed to when they were inspected. The trial court noted the objection but allowed the testimony.

*Medical Evidence*

According to the LaSalle General Hospital records, Mrs. Peoples presented to the ER on August 10, 2004, complaining of a headache and pain in her neck, right wrist, right arm, right shoulder, and right knee. She was diagnosed with neck strain and contusions to her right hip, knee, shoulder, and arm, and she was discharged with prescriptions for pain medications. X-rays were taken of her chest, pelvis, cervical spine, right shoulder, right hip, right forearm, right elbow, right wrist, right hand, right knee, and right ankle. No fractures or dislocations were disclosed in the radiology report; however, it was noted that Mrs. Peoples had some degenerative disease or degenerative changes in her cervical spine, right wrist, right hand, and right shoulder. She was diagnosed with a neck strain and contusions to her right hip, knee, shoulder, and arm. She was prescribed pain medication and advised to follow up with her doctor. Mrs. Peoples returned to the ER several days later with complaints of right arm and shoulder pain, numbness, and tingling in her right hand. She was diagnosed with radicular arm pain, given additional medications, and discharged.

An EMG (electromyogram)/nerve conduction study was performed on Mrs. Peoples on December 10, 2004. The attending physician interpreted the results as indicating that Mrs. Peoples had bilateral carpal tunnel syndrome affecting the sensory fibers of the median nerve.

Mrs. Peoples underwent an MRI of her cervical spine on January 6, 2005. The radiologist's impression was that she had a small central disc bulge at C3-4; mild bilateral foraminal narrowing, slightly greater on the right than the left, at C4-5; and, mild left foraminal narrowing at C5-6 and C6-7 secondary to osteophyte formation. Further, degenerative changes were greatest at C4-5 where there was effacement of

the CSF (central spinal fluid) on the ventral aspect of the cord, which the radiologist described as secondary to a combination of a posterior bulging disc and posterior osteophyte formation. According to a note from an orthopaedic consult that Mrs. Peoples had at the Louisiana State University Health Sciences Center in Shreveport, the examining physician interpreted the MRI as showing mild stenosis (narrowing) at C3-4-5-6 with the worst area being C4-5 with HNP,[7] and facet arthropathy effacing the thecal sac. At another orthopaedic consult in Shreveport on September 16, 2005, the examining physician noted that Mrs. Peoples complained of progressively worsening neck and shoulder pain that radiated to her arms and hands but more to the right. She described her pain as constant with an intensity of six out of ten. The physician further noted that Mrs. Peoples had received minimal relief after three months of physical therapy and medication.

Mrs. Peoples had an MRI of her right shoulder on December 21, 2005. The radiologist's impression was that she had minimal AC joint hypertrophy that narrows the subacromial arch contacting the superior aspect of the supraspinatus muscle and that she had mild AC joint degenerative change with minimal impingement on the superior aspect of the supraspinatus muscle without associated alterations to suggest injury.

A second EMG/nerve conduction study performed on Mrs. Peoples on October 13, 2006, as a result of her continued shoulder and hand pain was interpreted by the attending physician as indicating bilateral carpal tunnel syndrome, greater on the right than the left, and right C5 and C6 radiculopathies. Dr. Brunet opined that the spinal stenosis noted on the January 2005 cervical MRI would account for the

_____

[7]Dr. Michael Brunet explained in his January 22, 2009 deposition, which was admitted as Plaintiffs' Exhibit 11, that he interpreted "HNP" to mean "herniated nucleus pulposus."

13

changes shown on the EMG, that is, the radiculopathy in the extremity was caused by the stenosis. He interpreted the results of both the MRI and EMG as showing that the source of the pain radiating from Mrs. Peoples' neck into her shoulders, arms, and hands was her spinal stenosis.

When Dr. Brunet first examined Mrs. Peoples on December 20, 2006, he found that she had pain in the "empty can position" of the right shoulder, consistent with rotator cuff pain, and he recommended that she undergo arthroscopic surgery of her right shoulder, with a simultaneous carpal tunnel release of her right wrist. Dr. Brunet performed the recommended surgery on January 3, 2007, wherein he decompressed Mrs. Peoples' right shoulder and debrided a 15-20% superficial tear in her rotator cuff. He noted that, after the right carpal tunnel release, there was a fair amount of synovitis (inflammation) in the carpal tunnel canal. Several weeks after the surgery, Dr. Brunet noted stiffness in Mrs. Peoples' right shoulder, and he recommended aggressive physical therapy to stretch it out. At a May 2, 2007 follow-up visit, he noted that she had developed a frozen shoulder as a complication from her shoulder surgery.

After she continued to complain of neck pain and headaches, another MRI of Mrs. Peoples' cervical spine was done on September 7, 2007. The radiologist's impression was that the test showed minimal broad-based disc protrusions as C4-5, C5-6, and C6-7. Dr. Brunet last treated Mrs. Peoples on June 11, 2008. At that time, he thought that she needed to see a neurosurgeon to address the radiculopathy and pain caused by the condition of her neck. When the "charity system" failed to timely arrange for her to have an orthopaedic consult, Dr. Brunet recommended that she see

14

a private neurosurgeon. He discussed with her that the next step would be to have epidural steroid injections and possibly surgery to her neck.

Dr. Brunet was of the opinion that, based on her history and the diagnostic studies, the pre-existing degenerative condition of Mrs. Peoples' cervical spine became symptomatic and chronic following her fall. He further believed that she may have had a predisposition to carpal tunnel syndrome that manifested itself after her neck pathology became symptomatic and the nerve root at C5-6 got sensitized from radiculopathy. He described Mrs. Peoples as a cooperative patient who was always honest, sincere, and consistent in her complaints.

In July of 2008, Mrs. Peoples began treating with Dr. Cobb, and she remained under his care until the trial of this matter. He reviewed Mrs. Peoples' January 6, 2005 cervical MRI and October 13, 2006 EMG and determined that she had disc spurring and protrusions at the C4-5 and C5-6 levels which explained the radiculopathy and pain that was occurring. Dr. Cobb explained that someone's nerve root irritation had to be "pretty severe" before they would have a positive EMG. Dr. Cobb ordered another cervical MRI, which was performed on July 17, 2008. His impression was that the MRI showed multilevel disc-related conditions of spondylosis, instability, and significant intermittent nerve root compression. Dr. Cobb's examination of her left wrist indicated that she had decreased sensation and a positive Tinel's (a test used to detect carpal tunnel syndrome), indicating that she had a carpal tunnel syndrome.

Dr. Cobb administered three injections to Mrs. Peoples' neck on November 14, 2008. On that same date, he prescribed a TENS unit to help relieve some of Mrs. Peoples' pain. At a follow-up visit on December 3, 2008, Mrs. Peoples reported

that the injections provided her with only temporary relief and that they gave her a headache but that she had gotten better.

Dr. Cobb was of the opinion that the injuries to Mrs. Peoples' neck and left wrist were caused by her August 2004 trip and fall accident, given the history that had been provided to him and the fact that he had seen nothing to the contrary to indicate otherwise. He agreed that a person can have a degenerative condition, such as that suffered by Mrs. Peoples, which, after a trip and fall incident, can become symptomatic and start to cause pain. As of her last visit with him, Dr. Cobb recommended to Mrs. Peoples that if she was having enough pain, she would need to undergo an anterior cervical decompression, discectomy, and fusion of the three problematic levels indicated in the July 2008 MRI. He cautioned, however, that the surgery would speed up the degenerative process and increase the risk of injury at the levels above and below the fusion. Dr. Cobb advised that the left carpal tunnel release could be performed, which would resolve her left wrist problem, even if she chose not to have the cervical surgery. If she were to not have either surgery, Dr. Cobb recommended that she see a pain management specialist and learn to live with her pain.

On April 18, 2006, Fred's sent Mrs. Peoples to Dr. Douglas Gamburg, a board-certified orthopaedic surgeon, for an independent medical examination (IME). Her complaints at that time were of sleeplessness and pain in the base of her neck, right shoulder, and right collarbone, and numbness in her right pinky finger. According to a letter sent to counsel for Fred's on April 19, 2006, Dr. Gamburg had reviewed Mrs. Peoples' medical records pertaining to the August 2004 trip and fall prior to their first meeting. His impression was that she had cervical osteoarthritis with

16

foraminal stenosis and acromioclavicular arthritis of her right shoulder with probable impingement syndrome, which he opined was not caused, but may have been aggravated, by her fall. He disagreed that the findings on the December 2004 nerve conduction study, coupled with her complaints, indicated that she had actual carpal tunnel syndrome. Further, Dr. Gamburg saw no need, at that time, for Mrs. Peoples to have surgical intervention to address her pre-existing cervical osteoarthritis.

**DISCUSSION**

The standard of review applicable to this matter was set out by the Louisiana Supreme Court in *Siverd v. Permanent General Insurance Co.*, 05-973, pp. 3-4 (La. 2/22/06), 922 So.2d 497, 499-500:

> A court of appeal should not set aside the factual findings of a trial court absent manifest error or unless clearly wrong. *Arceneaux v. Domingue*, 365 So.2d 1330 (La.1978). However, if a court of appeal finds that the trial court committed a reversible error of law or manifest error of fact, the court of appeal must ascertain the facts de novo from the record and render a judgment on the merits. *LeBlanc v. Stevenson*, 00-0157 (La.10/17/00), 770 So.2d 766. Although appellate courts should accord deference to the factfinder, they nonetheless have a constitutional duty to review facts. *Ambrose v. New Orleans Police Dep't Ambulance Serv.*, 93-3099, p. 8 (La.7/5/94), 639 So.2d 216, 221. Because appellate courts must perform this constitutional function, they have every right to determine whether the trial court verdict was clearly wrong based on the evidence or clearly without evidentiary support. *Ambrose* at p. 8-9, 639 So.2d at 221. The reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's findings; it must instead review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. *Stobart v. State of Louisiana, through Dep't of Transp. & Dev.*, 617 So.2d 880, 882 (La.1993). The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was reasonable. *Stobart*, 617 So.2d at 882. We have previously emphasized the principle that "if the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Stobart*, 617 So.2d at 882-83 (citing *Housley v. Cerise*, 579 So.2d 973 (La.1991) (quoting *Sistler v. Liberty Mutual Ins. Co.*, 558 So.2d 1106, 1112 (La.1990))).

17

Louisiana Revised Statutes 9:2800.6 governs merchant liability, providing, in pertinent part, as follows:

A. A merchant owes a duty to persons who use his premises to exercise reasonable care to keep his aisles, passageways, and floors in a reasonably safe condition. This duty includes a reasonable effort to keep the premises free of any hazardous conditions which reasonably might give rise to damage.

B. In a negligence claim brought against a merchant by a person lawfully on the merchant's premises for damages as a result of an injury, death, or loss sustained because of a fall due to a condition existing in or on a merchant's premises, the claimant shall have the burden of proving, in addition to all other elements of his cause of action, all of the following:

(1) The condition presented an unreasonable risk of harm to the claimant and that risk of harm was reasonably foreseeable.

(2) The merchant either created or had actual or constructive notice of the condition which caused the damage, prior to the occurrence.

(3) The merchant failed to exercise reasonable care. In determining reasonable care, the absence of a written or verbal uniform cleanup or safety procedure is insufficient, alone, to prove failure to exercise reasonable care.

C. Definitions:

(1) "Constructive notice" means the claimant has proven that the condition existed for such a period of time that it would have been discovered if the merchant had exercised reasonable care. The presence of an employee of the merchant in the vicinity in which the condition exists does not, alone, constitute constructive notice, unless it is shown that the employee knew, or in the exercise of reasonable care should have known, of the condition.

Thus, "[i]n order to prove merchant liability in a slip and fall case, the plaintiff must prove, in addition to the usual negligence requirements (duty, breach, cause in fact, and damages), those elements found in La.R.S. 9:2800.6(B)." *Dotson v. Brookshire Grocery Co.*, 04-83, p. 1 (La.App. 3 Cir. 5/12/04), 872 So.2d 1284, 1285.

18

### *The Plaintiffs' Expert Witness - Michael Frenzel*

Fred's contends that the trial court clearly erred in qualifying Mr. Frenzel as an expert and/or in admitting his testimony at trial. It submits that Mr. Frenzel's testimony could not aid the trier of fact in determining any facts at issue because he was not an eyewitness to the accident and because expert testimony is not necessary in a trip and fall case. Fred's further objected to Mr. Frenzel's expertise in the fields of accident investigation and reconstruction.

The plaintiffs point out that, at trial, Fred's did not object to Mr. Frenzel's qualifications but instead questioned whether any testimony that he could offer would be relevant and of assistance to the trier of fact.

Louisiana Code of Evidence Article 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." In *Mistich v. Volkswagen of Germany, Inc.*, 95-939, p. 8 (La. 1/29/96), 666 So.2d 1073, 1079, the Louisiana Supreme Court stated that "[a] trial judge has wide discretion in determining whether to allow a witness to testify as an expert, and his judgment will not be disturbed by an appellate court unless it is clearly erroneous."

In accepting Mr. Frenzel as an expert witness, the trial court noted that he was board certified nationally as a safety professional and that it thought that his testimony would be relevant. Moreover, the trial court relied extensively on Mr. Frenzel's testimony in finding that the plaintiffs met their burden of proving that Fred's was liable under La.R.S. 9:2800.6. We are convinced that the trial court did

19

not abuse its wide discretion in allowing Mr. Frenzel to testify as an expert, given his extensive experience in the field of safety and his thorough preparation with regard to this case. Clearly, his testimony "assist[ed] the trier of fact to understand the evidence" and "to determine a fact in issue." La.Code Evid. art. 702.

***Did Fred's Have Actual or Constructive Notice of the Hazardous Condition?***

Fred's readily admits that a box protruding in the aisle near the front door would present a hazardous condition. Nevertheless, it insists that the plaintiffs failed to prove that it either created the hazard or knew of the location of the boxes prior to the accident. The more likely scenario, Fred's submits, is that one of its customers moved the boxes to the area just minutes before Mrs. Peoples entered the store.

The plaintiffs counter that Mr. Williams admitted that the boxes that caused Mrs. Peoples to fall were put on the floor where the injury happened by employees of Fred's and that he had no knowledge of anyone moving the boxes after they had been arranged by its employees. Mr. Williams had further explained that, when the gazebo boxes were first put out for sale, there were as many as fifteen of them, but, as he noted in the accident report, they had sold down to just two by the time of Mrs. Peoples' accident. Finally, Mr. Williams described the boxes as being eight to ten feet long and weighing seventy-five to eighty pounds, too heavy for just one person to move. Given the foregoing testimony by Fred's manager on duty at the time of the accident, the plaintiffs submit that there was more than enough evidence to support the trial court's factual determination that Fred's had actual notice of the hazardous condition presented by the boxes because its own employees had created the condition by placing the boxes as they did and by failing to move the display once it had sold down to an unsafe height.

20

The trial court found that the boxes which caused Mrs. Peoples to trip "were part of a display that was created by Fred's. Therefore, Fred's did have actual or constructive knowledge of the condition." In doing so, the trial court noted that it found the plaintiffs, Mrs. Paul, Mr. Williams, and the plaintiffs' expert, Mr. Frenzel, to be credible witnesses.[8]

The plaintiffs and Mrs. Paul testified consistently as to the location of the boxes that caused Mrs. Peoples to trip, and Mr. Williams confirmed that location in the accident report. Mr. Williams testified to having acknowledged in his earlier deposition that Fred's employees had stacked the boxes in the location where the accident occurred, although he later testified that he had not instructed them to place the boxes so close to the front door. However, Mr. Frenzel testified that regardless of their exact location, two low-profile white boxes laying flat on a white floor near the entrance of a store created an unacceptable level of risk. In our opinion, the fact that Mr. Williams included in the accident report a statement that the boxes had sold down to only two supports the statement that Mr. Williams gave in his deposition, i.e., that Fred's employees had stacked the boxes near the store's entrance.

On the other hand, Fred's offered no support for its claim that customers must have moved the two gazebo boxes to the area near the front door only minutes before the plaintiffs entered the store; and, in fact, the testimony of its manager, Mr. Williams, weighs against the likelihood of that scenario. As noted by the trial court, Mr. Williams testified in his deposition that the boxes "weighed as much as 80 pounds" each and "were too heavy to be lifted by one person," making it unlikely

_____

[8]Although the trial court included Mr. Williams on the positive side of its credibility assessment, it concluded that the photographs taken by him did not accurately depict the scene of the accident, and it noted some disparity between his deposition testimony and his trial testimony.

21

"that two or more customers moved two heavy boxes to the front entrance of the store (an area . . . located between the manager's office and the customer service desk) without anyone noticing."

The record contains ample support for the factual finding made by the trial court that Fred's created the floor display that caused Mrs. Peoples to trip and fall. The trial court did not err in finding that the plaintiffs proved that Fred's had actual or constructive knowledge of the hazardous condition that caused Mrs. Peoples to trip and fall, thus satisfying their burden of proof under La.R.S. 9:2800.6(B)(2).

### *Did Fred's Fail to Exercise Reasonable Care?*

Fred's contends that the plaintiffs offered no evidence that it failed to exercise reasonable care, thus failing to meet its burden of proof under La.R.S. 9:2800.6(B)(3).

Mr. Frenzel testified that Fred's had violated its own policy, as well as the industry-wide standard regarding the minimum height that a floor display should be to prevent tripping hazards, i.e., three feet, by letting the gazebo box display sell down to such a low height. Based on the testimony of Mr. Williams, Mr. Frenzel opined that Fred's had also violated its own policy requiring hourly inspections to look for and correct conditions that could cause slip and fall injuries.

In its reasons for judgment, the trial court found that "Fred's failed to exercise reasonable care in correcting the dangerous condition" created by the gazebo boxes. The record before us contains sufficient evidence to support that finding. The trial court did not err in concluding that the plaintiffs satisfied their burden of proof under La.R.S. 9:2800.6(B)(3).

22

### Motion in Limine - Dr. Mansour

This matter was fixed for trial on January 27, 2009; the discovery cutoff date was December 28, 2008. On December 18, 2008, Fred's sent the plaintiffs a copy of its witness list, disclosing for the first time that it may call Dr. Mansour as an expert witness.[9] Dr. Mansour is a radiologist practicing with Central Louisiana Imaging, Inc. (CLI), the facility where Mrs. Peoples underwent an MRI on July 17, 2008, although Dr. Mansour was not the physician who reviewed her films.

On January 7, 2009, the plaintiffs filed a motion in limine seeking an order preventing Fred's from calling Dr. Mansour as a witness because of the untimely disclosure of their intent to use him as a witness.[10] The plaintiffs argued that although the witness list had technically been timely filed, albeit only three days before the discovery cutoff date, Fred's had not updated its response to discovery propounded to it on September 22, 2005, asking it to identify all witnesses with any knowledge of this matter and which of those witnesses they intended to call at trial, along with a brief description of each witnesses' anticipated testimony, thereby causing the plaintiffs undue prejudice and preventing them from being able to adequately prepare for trial.

Fred's opposed the motion in limine, contending that the plaintiffs could hardly claim prejudice by the timing of its disclosure that Dr. Mansour would be an expert witness given the fact that the plaintiffs had scheduled the depositions of two of Mrs. Peoples' treating physicians within three weeks of the trial date. Fred's further

---

[9]The witness list also disclosed for the first time that Fred's may call Dr. Joe Rankin or Dr. Lillian Garvin of Huey P. Long Medical Center, and Carl D'Arbor, Fred's District Manager, as witnesses.

[10]The plaintiffs' motion in limine also sought to prevent Fred's from calling Dr. Rankin or Dr. Garvin and Mr. D'Arbor as witnesses. The motion was denied as to those witnesses; however, the plaintiffs have not appealed that portion of the trial court's ruling.

claimed that the purpose of its calling Dr. Mansour was to have him summarize the MRI films taken of Mrs. Peoples in the past four years and that the plaintiffs should not be prejudiced by the testimony of a physician who treated Mrs. Peoples and whose business performed an MRI on her.

The trial court heard the motion for limine on January 20, 2009. Later that day, the trial court dictated an oral rendition of judgment granting the motion with regard to Dr. Mansour, declaring that his testimony and any report generated by him would be excluded from the trial. The trial court placed special emphasis on the fact that Fred's had admitted in its opposition that Dr. Mansour was one of Mrs. Peoples' treating physicians. It further noted that counsel for Fred's had participated in ex parte communications with Dr. Mansour in violation of La.Code Evid. art. 510, the article concerning the privilege between health care providers and their patients. Although it recognized that an exception to the privilege may exist when a patient puts her physical condition at issue in a judicial proceeding, the trial court observed that any such waiver of the privilege applied only as to testimony at trial or to discovery of the privileged communication by certain authorized discovery methods, neither of which applied to the information about Mrs. Peoples' condition exchanged between and discussed by Dr. Mansour and defense counsel.

On appeal, Fred's ignores the fact that it originally dubbed Dr. Mansour as one of Mrs. Peoples' treating physicians in an attempt to show that the plaintiffs would not be prejudiced by the timing of its disclosure of him as its expert witness. Instead, Fred's argues that the trial court's exclusion of Dr. Mansour's testimony was prejudicial because it was prevented from presenting expert testimony regarding the extent of Mrs. Peoples' injuries.

A motion in limine is an evidentiary matter in which the trial court is afforded great discretion. *Randall v. Concordia Nursing Home*, 07-101 (La.App. 3 Cir. 8/22/07), 965 So.2d 559, *writ denied*, 07-2153 (La. 1/7/08), 973 So.2d 726. *See also Heller v. Nobel Ins. Group*, 00-261 (La. 2/2/00), 753 So.2d 841.

The plaintiffs were clearly caught off guard by the timing of Fred's disclosure that it intended to call Dr. Mansour as an expert witness, and Fred's should not be allowed to benefit from having ex parte communications with Dr. Mansour. *See Wood v. Am. Nat'l Prop. & Cas. Ins. Co.*, 07-1589 (La.App. 3 Cir. 12/23/08), 1 So.3d 764. In addition, any prejudice that Fred's may have suffered as a result of not having an expert radiologist at trial was caused by its waiting until the last minute to name an expert and choosing to name one of Mrs. Peoples' treating physicians as its expert. Given the totality of the circumstances, we cannot say that the trial court abused its great discretion in granting the plaintiffs' motion in limine with regard to Dr. Mansour.

### Were the Plaintiffs' Injuries Proximately Caused by Fred's Conduct?

Fred's contends that Mrs. Peoples' complaints of pain are simply the result of degenerative processes and/or pre-existing conditions and that she failed to prove a causal connection between the accident and her subsequent injuries. The plaintiffs counter that Mrs. Peoples was in good health and enjoyed an active life before being injured but that since her injury, she has experienced continuous and progressively worsening pain in her neck, right shoulder, wrists, and hands, in addition to headaches and frequent sleeplessness.

In *Housley v. Cerise*, 579 So.2d 973, 980 (La.1991) (alteration in original), quoting *Lukas v. Insurance Co. of North America*, 342 So.2d 591 (La.1977), the Louisiana Supreme Court stated:

> [a] claimant's disability is presumed to have resulted from an accident, if before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing that the medical evidence shows there to be a reasonable possibility of causal connection between the accident and the disabling condition.

Several years later, the supreme court reiterated that, "[i]n order to defeat the [*Housley*] presumption, defendant must show some other particular incident could have caused the injury in question." *Maranto v. Goodyear Tire & Rubber Co.*, 94-2603, p. 6 (La. 2/20/95), 650 So.2d 757, 761 (citation omitted).

Moreover, as this court noted recently in *Bienemann v. State Farm Mutual Automobile Insurance Co.*, 08-1045, p. 4 (La.App. 3 Cir. 2/4/09), 3 So.3d 621, 623 (alteration in original) (citations omitted):

> [t]he defendant's liability for damages is not mitigated by the fact that the plaintiff's pre-existing physical infirmity was responsible in part for the consequences of the plaintiff's injury by the defendant. It is clear that a defendant takes his victim as he finds him and is responsible for all natural and probable consequences of his tortious conduct.

In its reasons for judgment in this case, the trial court noted that:

> The record is completely devoid of anything to suggest that Mrs. Peoples had any of her post-accident symptoms prior to her fall on August 10, 2004. To the contrary, the evidence supports a finding that Mrs. Peoples was in good health and did not have any problems relating to her neck, right shoulder and her wrists.

Accordingly, the trial court applied the *Housley* presumption in Mrs. Peoples' favor, and because Fred's produced no evidence to show that some other incident could have caused her complaints, the trial court concluded that Mrs. Peoples was entitled to be compensated by Fred's for the injuries she received as a result of her August

2004 fall. In a very thorough and detailed analysis, the trial court dissected the medical evidence and determined that Mrs. Peoples was entitled to general damages with regard to the injuries to her right shoulder, her neck, and her right wrist, which it separately assessed as to each injured area. The trial court explained that, although Mrs. Peoples "may at times experience some radicular pain in her left arm, wrist[,] or hand, the evidence supports a finding that this pain is a result of and/or associated with her neck injury[,] and, therefore[,] compensation of the left wrist was addressed therein[, i.e., in the general damage award for her cervical injury]."

We have reviewed the testimony and evidence in its entirety and find that they support the trial court's conclusion that Mrs. Peoples was entitled to be compensated by Fred's for the neck, right shoulder, and right wrist injuries she received as a result of her August 2004 fall. Likewise, the law supports the trial court's finding that a defendant takes its victim as it finds her and that Fred's must compensate Mrs. Peoples to the full extent of her injuries, including the aggravation of any pre-existing conditions. The trial court did not err in finding that Fred's conduct caused Mrs. Peoples' injuries.

### Did the Trial Court Issue Excessive or Inadequate Damage Awards?

The trial court awarded Mrs. Peoples general damages as follows: (1) $55,000.00 for her right shoulder injury; (2) $85,000.00 for her cervical injury and left-sided pain; and (3) $25,000.00 for her right wrist injury. The judgment also awarded Mrs. Peoples all of the past medical expenses that she incurred as a result of each of those injuries.

In brief, Fred's contends that "there was absolutely no evidence" to support any of those awards. Alternatively, Fred's contends that the amounts awarded for

27

Mrs. Peoples' injuries are excessive and out of line with the damages awarded for similar injuries in other cases. The plaintiffs, on the other hand, submit that the general damages awarded to each of them are too low and that the jurisprudence actually supports much higher awards.

In *Guillory v. Lee*, 09-75, p. 14 (La. 6/26/09), 16 So.3d 1104, 1116-17, the Louisiana Supreme Court offered the following guidance with regard to the appellate standard of review of damage awards:

> It is well-settled that a judge . . . is given great discretion in its assessment of quantum, both general and special damages. Louisiana Civil Code article 2324.1 provides: "In the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury." Furthermore, the assessment of quantum, or the appropriate amount of damages, by a trial judge . . . is a determination of fact, one entitled to great deference on review.
>
> . . . .
>
> Because the discretion vested in the trier of fact is so great, and even vast, an appellate court should rarely disturb an award on review.

The supreme court further explained that:

> Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court.

*Id.* at 1117 (quoting *Wainright v. Fontenot*, 00-492, p. 6 (La. 10/17/00), 774 So.2d 70, 74).

*Mrs. Peoples' Right Shoulder Injury*

In making its $55,000.00 general damage award to compensate Mrs. Peoples for the injury to her right shoulder, the trial court took into account the fact that the injury required her to seek medical treatment, including surgery, which left her with a frozen shoulder, a condition that lengthened her recovery period. The trial court

28

noted, however, that the surgery was successful and that no further treatment was indicated.

After having examined the medical evidence in its entirety, we conclude that the record supports the trial court's award of $55,000.00. Given the vast discretion afforded the trial court in setting general damage awards, we cannot say that the award is either too high or too low, and, thus, we affirm the award.

*Mrs. Peoples' Cervical and Left-sided Injuries*

In awarding Mrs. Peoples $85,000.00 in general damages to compensate her for her cervical and left-sided pain, the trial court found that while it was undisputed that she suffered from pre-existing arthritic problems in her neck, Fred's was nonetheless liable for the aggravation of her cervical condition due to the August 2004 accident. Nonetheless, the trial court took into account the fact that the records reflected "gaps in treatment of the cervical spine and a number of medical visits where Mrs. Peoples either specifically denied or failed to indicate any pain or other problems in her cervical region." The trial court noted that "Dr. Cobb was very candid in his assessment of [Mrs. Peoples'] current condition being the result of pre-existing osteophytic formations that were aggravated by the fall" and that if such aggravation did not resolve within six months, the condition "could become chronic." With regard to Mrs. Peoples' left hand and wrist issues, the trial court referenced Dr. Cobb's opinion that those problems "could be related to the spinal conditions and/or to positional intolerance" and that "Mrs. Peoples was predisposed to this syndrome."

The trial court noted that Dr. Cobb's surgery recommendations were "primarily based on Mrs. Peoples' continued subjective complaints of pain (in conjunction with

29

objective findings)" and that Dr. Cobb had also given Mrs. Peoples the option of seeing a pain management specialist to learn to live with her pain. The trial court found "significant the fact that at the time of trial, over four years had passed since the accident and no surgery was scheduled."

The trial court's award of $85,000.00 as compensation for Mrs. Peoples' neck injury and left-sided pain is supported by the medical evidence. Although we may feel that a different award would have been more appropriate given the length of time since the accident and the fact that Mrs. Peoples has yet to schedule any surgeries with regard to her neck or left wrist, factors that the trial court did consider, we are unable to say that the trial court abused its great discretion in making its award. In deference to the applicable standard of appellate review, the trial court's $85,000.00 award for these injuries is affirmed.

*Mrs. Peoples' Right Wrist Injury*

In awarding Mrs. Peoples $25,000.00 in general damages to compensate her for the pain and suffering she endured as a result of the injury to her right wrist, the trial court observed that Mrs. Peoples had broken her fall with her right hand and that her injury had required her to undergo a carpal tunnel release surgery.

When read as a whole, the record supports the trial court's general damage award in this regard. As with her right shoulder injury, Mrs. Peoples' right wrist injury resolved after a successful surgical procedure. Given the vast discretion afforded a trial court in its assessment of damages, we cannot say that the $25,000.00 awarded represents an abuse of that discretion or that the award is either too high or too low; the award is affirmed.

*Mr. Peoples' Loss of Consortium Award*

In *Bellard v. South Central Bell Telephone Co.*, 96-1426, p. 21 (La.App. 3 Cir. 8/27/97), 702 So.2d 695, 707, *writ denied*, 97-2415 (La. 12/12/97), 704 So.2d 1202 (citations omitted), this court explained:

> In order to prove a claim for loss of consortium, a plaintiff must prove three things: (1) the liability of the defendant, (2) his or her spouse's damages, and (3) his or her consequent loss of consortium damages. Loss of consortium is more than just a loss of general overall happiness, it also includes love and affection, society and companionship, sexual relations, the right of performance of material services, the right of support, aid, and assistance, and felicity. The trier of fact is given much discretion in awards for loss of consortium and will not be overturned on appeal in the absence of manifest error.

The plaintiffs contend that the $7,500.00 awarded to Mr. Peoples for the loss of consortium that he suffered as a result of his wife's 2004 injury is inadequate to fully compensate him for his losses.[11] In making its award, the trial court noted that both Mr. and Mrs. Peoples testified that they were unable to enjoy some of the activities that they had enjoyed prior to the accident and that Mr. Peoples "has had to assume more of the daily household chores." Nevertheless, the trial court stated that because the "[e]vidence established that Mr. Peoples also suffers from a debilitating illness and was, in fact, receiving disability income as a result of his illness . . . it is assumed that their lifestyle changes may be due in part to Mr. Peoples' own limitations."

Keeping in mind the great discretion afforded to the trier of fact in awarding the spouse of an injured party damages for loss of consortium and given the record before us, we are unable to say that the trial court committed manifest error in

---

[11]The cases which the plaintiffs cite in support of their argument were previously cited to the trial court in the plaintiffs' post-trial memorandum.

31

assigning the value that it did to Mr. Peoples' damages; hence, the $7,500.00 loss of consortium award is affirmed.

***Did the Trial Court Err in Failing to Include in its Award for Future Medical Expenses the Costs for Surgery to Mrs. Peoples' Left Wrist and Neck?***

> The plaintiff bears the burden of proving special damages by a preponderance of the evidence. In meeting her burden of proof on the issue of future medical expenses, the plaintiff must show that, more probably than not, these expenses will be incurred and must present medical testimony that they are indicated and the probable cost of these expenses. An appellate court reviews an award of special damages pursuant to the manifest error standard of review.

*Cormier v. Colston*, 05-507, p. 9 (La.App. 3 Cir. 12/30/05), 918 So.2d 541, 547-48 (citations omitted).

The trial court awarded Mrs. Peoples $20,000.00 in future medical expenses, stressing that the medical evidence was "not clear cut" and that Dr. Cobb had given Mrs. Peoples the option of having a cervical fusion and/or a left carpal tunnel release, or, alternatively, the option of continuing with conservative measures.

The plaintiffs presented evidence concerning the total estimated costs for her to undergo a three-level cervical fusion ($66,848.76) and a carpal tunnel release of the left hand ($6,785.00). On the other hand, Dr. Cobb's office charged $2,750.00 for the three epidural steroid injections that Mrs. Peoples received on November 14, 2008, and the anesthesia bill associated with the injections totaled $690.00. We infer, based upon the amount that the trial court awarded for future medical expenses, that it did not believe that Mrs. Peoples met her burden of proving, more probably than not, that she would actually undergo the cervical fusion and incur the expenses associated with such a procedure. Inasmuch as the trial court's factual findings were based on its appreciation of what future treatment Mrs. Peoples was most likely to actually seek, we cannot say that the trial court committed manifest error in awarding

32

Mrs. Peoples an amount sufficient to cover continued conservative treatment for the injuries that she incurred as a result of her August 2004 trip and fall at Fred's. We find that there is sufficient medical evidence to support the trial court's $20,000.00 future medical expenses award, and the award is affirmed. The trial court did not err in failing to include in its future medicals award an amount sufficient to cover surgeries to both her neck and her left wrist.

***Did the Trial Court Err in Granting Fred's a Credit Against Mrs. Peoples' Past Medical Expenses or, Alternatively, Did the Trial Court Err in Failing to Require Fred's to Pay Legal Interest on the Amount of the Credit?***

The plaintiffs claim that the trial court erred in granting Fred's a credit for medical expenses that it had paid to Huey P. Long Medical Center and Medicaid on behalf of Mrs. Peoples because Fred's did not plead or prove its entitlement to such a credit. In the event that this court affirms the trial court's decision to allow Fred's a credit, the plaintiffs claim that the trial court erred in failing to require Fred's to pay them legal interest on all amounts awarded to them from the date of judicial demand until paid and with any payments made by Fred's to be imputed first to interest.

Fred's counters that the issue of credit was addressed at both the trial and at the hearing on post-trial motions. In fact, Fred's submits that the plaintiffs' attorney admitted at the June 29, 2009 post-trial hearing that there was no outstanding debt owed to Huey P. Long Medical Center. Further, Fred's claims that no legal interest is owed on the $18,010.40 credit because that amount was not outstanding.

Louisiana Code of Civil Procedure Article 1154, entitled "Amendment to conform to evidence," provides as follows:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised by the pleading. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to

33

raise these issues may be made upon motion of any party at any time, even after judgment; but failure to so amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby, and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense on the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

In *Kold, Inc. v. H & A Gas Purchasing, Inc.*, 609 So.2d 328, 329-30 (La.App. 3 Cir. 1992), this court held that, "Amendment of pleadings should be liberally allowed, providing the movant is acting in good faith, the amendment is not sought as a delaying tactic, the opponent will not be unduly prejudiced, and the trial of the issues will not be unduly delayed."

We are convinced that the trial court did not err in allowing Fred's to submit evidence that it was entitled to a credit due to its having compromised the debt owed by the plaintiffs to Huey P. Long Medical Center. Despite Fred's failure to have pled such a credit before trial, the plaintiffs offered no proof that Fred's acted in bad faith or that it sought to delay the matter in seeking the credit, nor did they prove that they were unduly prejudiced by the trial court's application of the credit to plaintiffs' damage award. Moreover, because the plaintiffs failed to offer any relevant jurisprudence in support of its argument that the trial court should have awarded them interest on the amount credited to Fred's from the date of judicial demand until that amount was paid, we decline to disturb the trial court's decision in that regard.

### DECREE

For the foregoing reasons, the judgment of the trial court, as amended following the resolution of post-trial motions, is affirmed in its entirety. Costs of this appeal are assessed equally amongst the parties.

**AFFIRMED.**